**In re PEARSON INDUSTRIES, INC., Debtor.**

**In re INDUSTRIAL & MUNICIPAL ENGINEERING, INC., Debtor.**

**Richard E. BARBER, Chapter 7 Trustee for Pearson Industries, Inc., and Industrial & Municipal Engineering, Inc., Plaintiff,**

v.

**RIVERSIDE INTERNATIONAL TRUCKS, INC., Defendant/Third Party Plaintiff,**

v.

**BIOPLUS MANUFACTURING, INC., Third Party Defendant.**

**Bankruptcy Nos. 89–81684, 89–81834. Adv. Nos. 90–8119, 90–8110.**

United States Bankruptcy Court, C.D. Illinois.

July 31, 1992.

See also 127 B.R. 848.

Barry M. Barash, Galesburg, Ill., for plaintiff.

Richard A. Davidson, Davenport, Iowa, for Riverside.

Thomas L. Perkins, Peoria, Ill., for Bioplus.

Richard E. Barber, Galesburg, Ill., Chapter 7 Trustee.

## OPINION

WILLIAM V. ALTENBERGER,
Bankruptcy Judge.

The Defendant, RIVERSIDE INTERNATIONAL TRUCKS, INC. (Riverside) is a truck dealership located in Davenport, Iowa. INDUSTRIAL & MUNICIPAL ENGINEERING, INC., (Debtor) previously located in Galva, Illinois, was a manufacturer of specialized farm equipment. PEARSON INDUSTRIES, INC. was a corporation related to the Debtor through common ownership. The Debtor would acquire bare truck chassis from Riverside and then modify the chassis and add additional equipment to produce altered units designed for either fertilizer application or sludge removal. The altered units were then sold by the Debtor to end users. The following relationships were entered into and procedures utilized to achieve this result.

In 1987 Riverside and the Debtor orally agreed to a relationship whereby the Debtor would acquire bare truck chassis from Riverside. The Debtor would give Riverside the Debtor's requirements and specifications for chassis manufactured by Navistar International (Navistar). Riverside would then obtain the chassis from Navistar, with the chassis initially being delivered to Riverside's facility in Davenport, Iowa. When the chassis arrived at Riverside's Davenport facility, Riverside would prepare them and, as needed by the Debtor, deliver them to the Debtor's facility in Galva, Illinois. Usually, but not always, Riverside would send the Debtor an invoice for the purchase price of the chassis. These were in the range of $38,000.00 to $40,000.00. Payment for the chassis was not due until the Debtor sold the altered units to the end users.

The Manufacturer's Certificates of Origin were handled in one of two ways. For the chassis being modified for fertilizer application, the Navistar Certificate of Origin would be delivered to Riverside, which would in turn deliver them to the Debtor. The Debtor would then issue its own Certificate of Origin for the modified unit to the end user. For the sludge removal units, the Certificate of Origin issued by Navistar would be delivered to Riverside, then on to the Debtor and ultimately the end user. Usually Riverside did not release the Certificates of Origin until the Debtor paid Riverside for the chassis. However, on sales to municipalities, the Certificates of Origins went to the Debtor before Riverside was paid. Riverside maintained insurance on the chassis until it was paid and did not issue the warranty until that point in time.

Riverside financed its acquisition of the chassis through a secured floor plan arrangement with Associates Financial Corporation (Associates). Riverside executed and delivered to Associates a Security Agreement and Financing Statement. Associates filed the financing statement with the Iowa Secretary of State. As to the chassis, Associates was a secured creditor of Riverside.

The Debtor financed its operations through a financial arrangement with Fremont Financial (Fremont). The Debtor did not give either Riverside or Associates a security agreement or a financing statement to be filed against the Debtor with the Illinois Secretary of State.

Part of the oral agreement between Riverside and the Debtor provided that the Debtor would reimburse Riverside for the interest Riverside paid to Associates. An agreement between Navistar, Riverside and Associates provided for the first forty-five days to be an interest free floor plan. Riverside extended this benefit to the Debtor. If the truck chassis were delivered to Riverside, then to the Debtor, modified, and sold to the end user, all in forty-five days, the transaction was interest free for the Debtor as well.

While the chassis were in the Debtor's possession, they were subjected to a floor plan check by the Associates. The Debtor knew that Associates was financing Riverside and that Associates conducted a monthly floor plan check at the Debtor's Galva premises, to determine if there was an out of trust situation. However, there was no notice, sign or other indication at Debtor's Galva premises indicating to third parties that Riverside or Associates had any interest in the chassis.

Once the modifications were completed, the altered units were sold to the end user. When the end user paid the Debtor, the Debtor was obligated to pay Riverside. Usually this occurred by the Debtor depositing the funds into a special account maintained as part of the Debtor's financial arrangement with Fremont. Fremont would withhold any amount due it and remit the balance back to the Debtor. The Debtor would then pay Riverside.

There was no regular cycle associated with this course of dealing. It could be anywhere from 30 to 90 days for a complete cycle to run its course. This course of dealing started in 1987 with Riverside providing the Debtor with approximately 20 to 25 chassis per year, until sometime in 1989 when the Debtor fell upon financial hard times.

In August of 1989, Bioplus Manufacturing, Inc. (Bioplus) and the Debtor entered into a contract for Bioplus's purchase of a fertilizer unit for $105,500.00, with the Debtor receiving a $21,000.00 down payment. When the delivery date called for by the contract could not be met, the Debtor loaned Bioplus a demonstrator until the unit called for by the contract could be delivered. Bioplus incurred certain expenses, to pick up the demonstrator unit, and to further modify it. It also incurred certain losses associated with not having a suitable unit which forced it to transfer some of its contracts with its customers to other suppliers. Subsequently, when the Debtor could not deliver the unit required by the contract, the Debtor offered to sell the loaner unit to Bioplus for $79,550.00 less Bioplus' deposit.

In August of 1989, as part of a routine floor plan check, Associates could not locate an altered unit. Associates notified Riverside. Believing that the Debtor was out of trust, Riverside went to the Debtor's Galva facility and repossessed all the truck chassis at that location. The chassis repossessed by Riverside had been partially modified by the Debtor. These initial phase modifications included raising the cab, modifications to the fenders and bumpers, and other modifications to prepare the units for mounting the equipment. Later phase modifications including installation of large wheels and tires, liquid tank, boom spray arms, and other major items of equipment, had not been completed. After Riverside repossessed the units, two units were sold to another manufacturer for $41,300.00 and $41,360.00. Riverside also located the demonstrator unit in Bioplus' possession and called Bioplus and asserted it owned the chassis. Riverside and Bioplus then agreed that Bioplus would purchase the chassis from Riverside for $38,200.00 and that Bioplus would make its own deal with the Debtor for the equipment. Subsequently, Bioplus sold this unit to a third party for $67,000.00.

During the 90 days preceding the filing of the Debtor's Bankruptcy petition, Riverside received the following payments:

| Date | Check No. | Amount | Payment For | Payor |
|------|-----------|--------|-------------|-------|
| 07/21/89 | 6574 | $ 6,771.64 | Parts & Labor | Pearson |
| 08/07/89 | 5785 | $ 8,406.96 | Interest | Debtor |
| 08/07/89 | 5786 | $38,200.00 | Truck Chassis | " |
| 08/21/89 | 5814 | $41,074.00 | Truck Chassis | " |
| 08/24/89 | 5837 | $38,200.00 | Truck Chassis | " |
| 09/06/89 | 5874 | $68,415.00 | 2 Truck Chassis | " |
| 09/25/89 | 5933 | $41,074.00 | Truck Chassis | " |

After the Debtor's and Pearson's Chapter 11 proceedings were converted to Chapter 7 proceedings, the Trustee in both Bankruptcies, who is the same individual, (Trustee) filed a preference action against Riverside to recover (1) the value of the units repossessed by Riverside; (2) the payments received within 90 days of bankruptcy; (3) the value of the demonstrator unit loaned to Bioplus and subsequently sold to

Bioplus by Riverside. The Trustee also seeks pre-judgment interest and his costs. In addition to filing an answer and certain affirmative defenses, which will be specified later in this Opinion, Riverside filed a third party complaint against Bioplus asserting that if it must pay the Trustee for the unit sold to Bioplus, it should recover from Bioplus any amount in excess of what Bioplus paid to it.

As part of their oral agreement, Riverside and the Debtor agreed that Riverside would retain title to the chassis until Riverside was paid. That part of their agreement forms the basis for part of Riverside's defense to the Trustee's preference claims. Therefore, prior to deciding the issues presented by the parties, it will be helpful to first classify the title retention relationship between Riverside and the Debtor pursuant to the provisions of the Uniform Commercial Code as adopted in Illinois. Ill.Ann.Stat. ch. 26 (Smith–Hurd 1974).

Prior to the adoption of the Uniform Commercial Code, the commercial laws of the State of Illinois recognized a variety of forms of secured lending, one of which was the common industry practice referred to as "trust receipt financing." With this form of secured lending, the lender would retain title, give the borrower possession of the collateral, with the borrower giving the lender a trust receipt for the collateral which provided that upon sale by the borrower the lender would be paid, at which time the lender would release the title to the borrower. This form of secured lending was common in the financing of inventory of "hard goods" or "big ticket items" such as heavy equipment or automobiles for dealers, who were going to resell the collateral to third party end users.

The drafters of the Uniform Commercial Code sought to set forth in Article 9 of the Code a set of rules, including those providing for the attachment and perfection of a security interest, governing all secured transactions. They did not eliminate the various forms of pre-code financing. They merely required that these forms of pre-code financing comply with the provisions of Article 9 of the Uniform Commercial Code governing secured transactions. 1

Gilmore, *Security Interests in Personal Property*, Section 10.1 and Section 10.2. After the adoption of the Uniform Commercial Code, many secured lenders continued to use the concept of trust receipt financing.

In Article 2 of the Uniform Commercial Code, the drafters provided an article to govern sales transactions. Just as for pre-Article 9 secured transactions, pre-Article 2 sales transactions took a variety of forms, and the drafters sought to provide, in one location, Article 2, a set of rules to govern sales transactions. In the process they recognized that the term "security interest" had traditionally also been used in some forms of sales transactions to describe the interests of a seller and a buyer, and by Section 9–102 and Section 9–113 of the Uniform Commercial Code, Ill.Ann.Stat. ch. 26, Sections 9–102 and 9–113 (Smith–Hurd 1974), made those security interests subject to Article 9 of the Uniform Commercial Code. Gilmore, *supra*, Section 11.3; 2 Hawkland, *A Transactional Guide to the U.C.C.*, para. 2.320302.

The drafters of the Uniform Commercial Code also recognized that traditionally in some forms of pre-Article 2 sales transactions, title retention had been used for a variety of reasons. In Article 2 the concept of title retention was retained but with provisions included to protect the buyer's creditors. *Hawkland, supra*, para. 2.320302 and 2.320303. The provisions of Article 2 recognize, and provide for, pre-code title retention sales transactions such as consignments, sale on approval, and sale or return.

How should the relationship between Riverside and the Debtor be classified? Should it be classified as being subject to the provisions of Article 9 of the Uniform Commercial Code governing secured transactions, or subject to the provisions of Article 2 of that Code governing sales? Under Section 9–102 of the Uniform Commercial Code, intent is the key. Intent can best be determined by examining the purpose to be achieved by the title retention in this case. After having heard the witnesses, this Court concludes

that Riverside's intent was to extend credit to the Debtor on a secured basis. The purpose of title retention was to insure Riverside was paid. Furthermore, Riverside's president testified he believed Riverside was doing business on a secured basis. The Debtor did not have to pay Riverside until the modified units were sold and the Debtor was paid. The arguments of Riverside's attorneys repeatedly refer to the Debtor being "out of trust." All this indicates that the parties thought they were conducting business on a secured basis, through the common industry practice of "trust receipt financing." In fact, Riverside sold the chassis to the Debtor, but was not a secured creditor as its security interest had not attached under Section 9–203 of the Uniform Commercial Code, Ill.Ann. Stat. ch. 26, para. 9–203, because the Debtor was in possession of the chassis and there was no written security agreement, and had not been perfected by filing of a financing statement pursuant to Section 9–401 of the Uniform Commercial Code, Ill. Ann.Stat. ch. 26, para. 9–401. Riverside is now attempting in part to defeat the Trustee's preference claims by relying on provisions in Article 2 of the Uniform Commercial Code or by piggybacking a secured relationship between itself and the Debtor from the secured relationship between itself and the Associates. Having determined the relationship between Riverside and the Debtor, the specific issues raised by Riverside and its supporting arguments will be addressed.

## THE ISSUES RAISED BY RIVERSIDE'S REPOSSESSING THE CHASSIS

 The first issue is strictly a factual one of whether Riverside repossessed two or three chassis. Under Section 547(g), 11 U.S.C. Section 547(g), the Trustee had the burden of proof that there were three chassis repossessed. However, the evidence supports Riverside's position that only two were repossessed. Normally in transactions of this nature documentation is available to track the transfer of property. The only available documents refer to just two chassis being at the Galva site at the time of the repossession. The Trustee could not provide any documents to support his claim

that three chassis were present and repossessed. Furthermore, representatives of Riverside and Associates along with two former employees of the Debtor, all testified that only two chassis were repossessed. The Debtor's witnesses could only testify that sometime before the repossession there were three chassis present at the Galva site. However, they did not witness the actual repossession and could not testify as to the number of chassis actually removed from the Debtor's Galva facility.

 The second issue is whether the repossession involved a "transfer of an interest of the debtor in property" as required by Section 547(b), 11 U.S.C. Section 547(b).

Having concluded that the parties' intended relationship constituted a failed attempt to create a secured relationship subject to the provisions of Article 9 of the Uniform Commercial Code, it follows that ownership of the chassis was in the Debtor, as a secured relationship is based on the concept that ownership is in a Debtor subject to the creditor's security interest, and that the repossession constituted a transfer of the Debtor's ownership interest in the chassis.

But even if the relationship was classified as being under Article 2 of the Uniform Commercial Code governing sales transactions, Riverside would fair no better. Relying on Section 2–401(2) of the Uniform Commercial Code, Ill.Ann.Stat. ch. 26, para. 2–401(2) (Smith–Hurd 1974), Riverside takes the position that as it retained title to the chassis the Debtor had no interest in them which could be transferred through the repossession. The Trustee counters by relying on Section 2–326 of the Uniform Commercial Code, Ill.Ann.Stat. ch. 26, Section 2–326, and taking the position that the transfer of the chassis to the Debtor was a "sale or return" thereby subjecting the chassis to the claims of the Debtor's creditors.

 This Court would start its analysis by agreeing with the court in *In re Vogue Coach Co.*, 132 B.R. 454 (Bkrtcy. N.D.Okla.1991), a case similar to the one before this Court, where the court stated:

The first element of an avoidable preference is that the debtor must have *transferred an interest in property.* Section 101(54) of the Bankruptcy Code defines transfer as follows:

Every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

This broad definition includes even a transfer of mere possession. In 4 *Collier on Bankruptcy*, Paragraph 547.03, at 547–17 (15th ed. 1991) the author states as follows:

This definition "is as broad as possible."

Under the definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody or control even if there is no transfer of title, because possession, custody, and control are interests in property (footnote omitted).

The Court finds a transfer occurred when Nissan repossessed the RVs one week prior to bankruptcy.

This transfer, however, is preferential only if the Debtor transferred an interest in its property. Since the term "interest of the debtor in property" is not defined in the Bankruptcy Code, one must look to state law to ascertain if the Debtor had an interest in the property transferred. 4 *Collier on Bankruptcy* Paragraph 547.03 at 547–23 (15th ed. 1991).

▆▆▆▆ Just as in *In re Vogue Coach Co., supra,* Riverside's taking of possession of the chassis constitutes a transfer, and a determination must be made if the Debtor had an interest in the chassis.

Section 2–401(2) relied on by Riverside provides in part as follows:

Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading.

For several reasons Riverside's argument, that as it and the Debtor agreed that title to the chassis remained in Riverside until it was paid, the Debtor had no interest in the chassis at the time of the repossession, misconstrues Section 2–401(2).

The initial paragraph of Section 2–401, reads as follows:

Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this Article and matters concerning title become material the following rules apply:

This initial paragraph specifically limits the application of subsection (2), in that each provision of Article 2, which would include Section 2–326, applies to the rights, obligations and remedies of Riverside, the Debtor, and third parties irrespective of title. Furthermore, this same initial paragraph of Section 2–401 states that the rules found in subsection (2) are applicable only if the situation is not covered by other provisions of Article 2, which again would include Section 2–326. Finally if Riverside could rely on Section 2–401(2), Section 2–401(1), which reads in part as follows:

Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.

would also be applicable to limit Riverside's retention of title to a reservation of a security interest.

▆▆▆▆ As is pointed out in the Illinois Code Comments:

Article 2 deals with issues between buyer and seller in narrow terms rather than on the broad term of whether or not title to the goods has passed. Official Comment 1. The concept of title is thus subordinated under the Code. Instead of approaching a sales problem by first locating title to the goods, as under the

Sales Act, a lawyer's approach starts with an analysis of the problem in terms of these narrow issues (i.e., risk of loss, insurable interest, seller's right to price, buyer's right to specific performance or replevin, and *rights of creditors of seller and of buyer*) and an ascertainment of whether the Code deals specifically with its issues. (Emphasis added.) Ill.Ann.Stat. ch. 26, para. 2–401 (Smith–Hurd 1974). It follows that the proper analysis is to ascertain the problem and see if the Uniform Commercial Code deals with it without reference to title. If it does, title is of no significance.

The problem as presented in this case by Riverside is dealt with by Section 2–326 of the Uniform Commercial Code, which provides in part as follows:

(1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is

. . . .

(b) a "sale or return" if the goods are delivered primarily for resale.

(2) [G]oods held on sale or return are subject to such claims [claims of the buyer's creditors] while in the buyer's possession.

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery

(a) complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign, or

(b) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

(c) complies with the filing provisions of the Article on Secured Transactions (Article 9).

 The agreement between Riverside and the Debtor provided for Riverside's delivery of chassis to the Debtor to be modified and resold by Debtor to its customers. This type of arrangement comes within the sale or return provisions of Section 2–326. The Debtor held possession of the chassis, thereby subjecting the chassis to claims of the Debtor's creditors pursuant to Section 2–326(2). The chassis were delivered to Debtor for resale at Debtor's place of business at which it dealt in chassis, under the Debtor's name, not Riverside's, thereby classifying the arrangement as a sale or return under Section 2–326(3), and none of the exceptions were triggered as there was no sign posted which would indicate Riverside's interest, there was no proof that Debtor's creditors generally knew Debtor was engaged in selling Riverside's goods, and there was no Article 9 filing. In *accord: See In re Flo–Lizer, Inc.*, 946 F.2d 1237 (6th Cir.1991); *In re Vogue Coach Co., supra.*

In summary, under either Article 9 or Article 2 of the Commercial Code, notwithstanding Riverside's retention of title, the Debtor clearly had an interest in the chassis which was transferred by the repossession.

The third issue is whether the repossession diminished or depleted the Debtor's bankruptcy estate. Riverside takes the position that as the Associates held a lien on the chassis and as the Debtor had no equity in the chassis because the amount of the lien equalled the value of the chassis, the Debtor's estate was not diminished by the repossession. To support its position that the Associates held a valid lien on the chassis Riverside relies on the following analysis under the provisions of the Uniform Commercial Code.

First, when Riverside borrowed from the Associates, the Associates' lien was validly perfected against Riverside according to the Uniform Commercial Code as adopted in Iowa. The Trustee does not contest this assertion.

Second, when the chassis were moved to the Debtor's site in Galva, Illinois, they remained subject to the Associates' lien for a four month period pursuant to Section 9–103(1)(d) of the Uniform Commercial Code. Ill.Ann.Stat. ch. 26, para. 9–103(1)(d) (Smith–Hurd 1974). Again, the Trustee does not contest this assertion.

Third, relying on Section 9–306(2) of the Uniform Commercial Code, which provides as follows:

> Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

Ill.Ann.Stat. ch. 26, Section 9–306(2) (Smith–Hurd 1974), and Section 9–307(1) of the Uniform Commercial Code which provides as follows:

> [A] buyer in the ordinary course of business, as defined in Subsection (9) of Section 1–201, takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

Ill.Ann.Stat. ch. 26, Section 9–307(1) (Smith–Hurd 1974), Riverside asserts that the chassis remained subject to the Associates' lien unless either the Associates authorized the transfer to the Debtor free and clear of the lien, or the Debtor was a buyer in the ordinary course of Riversides' business, which the Debtor was not under the definition of that term found in Section 1–201(9) of the Uniform Commercial Code, which provides as follows:

> [A] person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in the ordinary course from a person in the business of selling goods of that kind ... "Buying" may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as

security for or in total or partial satisfaction of a money debt.

Ill.Ann.Stat. ch. 26, Section 1–201(9) (Smith–Hurd 1974). It is at this point that the Trustee disagrees with Riverside's analysis.

■ Riverside's assertion under Section 9–306(2) that the chassis remained subject to the Associates' lien unless the Associates authorized the transfer to the Debtor *free and clear of the lien*, misreads Section 9–306(2). All that Section 9–306(2) requires is for the Associates to authorize the transfer, which it did. Section 9–306(2) does not require that the authorization include a release of the lien.

■ Likewise, Riverside's assertion that the Debtor does not qualify as a buyer in the ordinary course of business misapplies Section 1–201(9) of the Uniform Commercial Code. Associates is correct when it states that in order for the Debtor to be a buyer in the ordinary course of business four elements must exist. First, Associates' security interest must have been created by Riverside. It was. Second, the Debtor did not obtain the chassis in bulk or as security for a pre-existing debt. It didn't. Third, Riverside must be in the business of selling chassis. It is.

Fourth, that the Debtor purchased in good faith without knowledge that the purchase was in violation of ·the ownership rights or security interest of the Associates. It is at this point that Riverside's assertion fails. It fails because the purchase by the Debtor was not in violation of the Associates' security interest. The Associates knew about the business arrangement between the Debtor and Riverside. It authorized the transfer of the chassis by Riverside to the Debtor. It authorized the modifications and resales to end users. The Associates understood that until the Debtor sold the chassis and got paid, Riverside would not get paid, and until Riverside got paid, the Associates would not get paid. At the time of the transfer of the chassis to the Debtor, everything was functioning as intended and there was no violation of the Associates' security interest. After the transfers the Associates conducted periodic

floor plan checks to be sure the Debtor had not sold a chassis without paying Riverside. These floor plan checks indicated everything was functioning as planned, until the last inventory when it was discovered the Debtor had not paid for one modified unit. It was at this point in time that there was a violation of the Associates' security agreement with Riverside. But the violation occurred after the Debtor had already qualified for buyer in the ordinary course of business, and the violation could not be applied retroactively to deny the Debtor buyer in the ordinary course of business status. *Huber Pontiac, Inc. v. Wells,* 59 Ill.App.3d 14, 16 Ill.Dec. 518, 375 N.E.2d 149 (4th Dist.1978); *C. Jon Dev. Corp. v. Pand–Rorsche Corp.,* 69 Ill. App.2d 469, 217 N.E.2d 416 (4th Dist.1966). This is especially true where that status is important because of a dispute between the Associates and third parties, the Debtor's creditors.

■ The last issue involving the repossessed truck chassis is their value. The Trustee asserts they are worth $45,000.00 each. It is not possible to ascertain how the Trustee came to that exact figure for each unit. The testimony was that the bare chassis had a value to the Debtor, and that as they went through various phases of improvement (phases 1 through 4) the value to the Debtor increased. The evidence also indicated that the cost of the first phase improvement was $6,000.00 with a retail value of $9,000.00. The two repossessed chassis were undergoing phase 1 improvement. However, the evidence does not indicate the nature and extent of these improvements and what value the improvements added to the chassis. Therefore, this Court is going to use the value that Riverside received when it repossessed and resold these units. These values are $41,300.00 and $41,360.00 for a total of $82,660.00.

### THE ISSUES RAISED BY THE PAYMENTS WITHIN NINETY DAYS OF BANKRUPTCY

The payments fall into three categories: The five payments totaling $226,963.00 for six chassis, the interest payment of $8,406.96, and the $6,771.64 payment made by Pearson for parts and labor provided to the Debtor. Riverside takes the position that as to the first category the payments were made in the ordinary course of business pursuant to Section 547(c)(2), and that as to the other two categories, the payments were a contemporaneous exchange for new value pursuant to Section 547(c)(1), or that the new value exception of Section 547(c)(4) is applicable.

■ Under Section 547(g) Riverside has the burden of proving the nonavoidability of those transfers. In order to establish the nonavoidability of the first category of payments under the ordinary course of business exception of Section 547(c)(2), Riverside must prove that the payments were

1. In payment of a debt incurred by the Debtor in the ordinary course of business or financial affairs of the Debtor and Riverside. The Trustee concedes they were.

2. Made in the ordinary course of business or financial affairs of the Debtor and Riverside. Again, the Trustee concedes they were.

3. Made according to ordinary business terms. It is this element that the Trustee disputes.

■ The first issue presented under Section 547(c)(2) is whether the test for determining what is ordinary business terms is, as Riverside argues, subjective, being consistent with the prior course of dealing between the Debtor and Riverside, or as the Trustee argues, objective, being consistent with industry practices or standards?

This Court recently had this same issue before it in *In re Hills Oil & Transfer, Inc.,* 143 B.R. 207, where, in adopting the objective test, stated:

> Adopting the subjective test requires subsections 547(c)(2)(B) and (C) to be read identically and thereby ignore subsection (C) or render it superfluous. *See* 1 Robert E. Ginsberg, *Bankruptcy; Text, Statutes, Rules,* 2d ed., (P.H.1991), Part VIII, Sec. 8.03(c), p. 616. This

Court does not believe that Congress would include a superfluous element and that in order to give meaning to all these elements the subjective test is required. This Court agrees with the court in *In re Loretto Winery, Inc.*, 107 B.R. 707 (9th Cir. BAP 1989) where the court stated:

It was the conclusion of the trial court that the third of these conditions, subparagraph (C), embodied an objective standard to be shown by the custom in the industry in which the transferee and debtor are engaged. We agree, for to graft upon the relevant terms anything but an objective yardstick would either ignore the operative nomenclature altogether, thereby making it a nullity, or interpret it in a manner which duplicates the requirement of subparagraph (B), thereby making it superfluous. (Citation omitted) Such a construction would run contrary to settled principles of construction by impermissibly rendering the statute inoperative or superfluous, and by failing to give effect to all the words employed by Congress. (Citations omitted)

While it is true that the decided cases are split on whether the test is subjective or objective in nature, and that at one point in time the majority position adopted the subjective test (*see Ginsberg, supra*) it no longer is true. Commenting upon this shift in favor of the objective test, the court in *In re Hancock–Nelson Mercantile Co., Inc.*, 122 B.R. 1006 (Bkrtcy.D.Minn.1991) stated:

In one of the more frequently-cited decisions applying section 547(c)(2), the court termed [the subjective test] the "majority" approach. *See In re Steel Improvement Co.*, 79 B.R. 681, 638–84 (Bankr.E.D.Mich.1987). *See also In re Unimet Corp.*, 85 B.R. 450, 453 (Bankr.N.D.Ohio 1988). A strict headcount of decisions extant at the time supports this characterization. Since then, enough other courts have adopted the alternate test that the characterization is no longer correct. *See In re Loretto Winery, Ltd.*, 107 B.R. 707, 710 (Bankr. 9th Cir.1989) (characterizing the alternate rule as

the "majority" rule). The court in *Steel Improvement Co.* itself adopted the then-"minority" rule.

In *Matter of Century Brass Products, Inc.*, 121 B.R. 136 (Bkrtcy.D.Conn.1990), the court also stated that a majority of jurisdictions now agree that "ordinary business terms" in subdivision (C) refers to "an objective standard to be shown by the custom in the industry in which the transferee and debtor are engaged", citing *Loretto Winery, supra.*[1]

---

[1] The subjective test, now clearly representing the minority view, still finds some support. In *In re Equipment Co. of America*, 135 B.R. 169 (Bkrtcy.S.D.Fla.1991), the court rejected the debtor's contention that the third condition contained in section 547(c)(2)(C) that the payment be "made according to ordinary business terms" is only satisfied if the payments conform to the ordinary business terms of the industry, and not simply those between the parties:

In [*In re*] *Southern Commodity* [*Corp.*, 78 B.R. 626 (Bkrtcy.S.D.Fla.1987) ], the court required that payments be made according to terms ordinary in the industry. However, reading 11 U.S.C. section 547(c)(2)(C) as requiring compliance with terms ordinary in the industry would negate any benefit the exception would convey. That reading would require that the parties conduct themselves according to business norms, restricting their chosen course of dealing to an industry standard. The exception was created to allow debtors and creditors to continue in their normal course of business, and "discourage unusual action by either the debtor or his creditor during the debtor's slide into bankruptcy." *In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir.1986). To hold otherwise would be to place the exception out of reach of all those debtors and creditors for whom it was written.

The next issue is whether the payments were consistent with industry practices or standards. Relying on the testimony of John Mravinac, Riverside's sales manager; Roy Schlinkert, an Associates employee; and Lavern Charlet, a former employee of the Debtor, that the standard practice in the industry is that payment is due at the time a modified unit is sold to the end user, Riverside argues it has met its burden of proof.

As the trier of fact and after having heard the testimony of those three individuals, this Court has serious doubts, and is not convinced, that industry standards or

practices would equate to doing business in the fashion found in this case. The testimony of John Mravinac and Roy Schlinkert was clearly that of interested parties and self serving. This Court would not expect their testimony to be any different. *See Fred Hawes Organization, Inc.*, 957 F.2d 239 (6th Cir.1992). Furthermore, there was no evidence which specifically described the details of industry practices similar to the one utilized in this case. The testimony of John Mravinac and Roy Schlinkert was that it was an industry practice for a supplier to be paid upon resale. While they testified that they utilized one aspect of an industry practice, they did not testify that the total arrangement utilized in this case was an industry practice. Riverside's president testified he believed Riverside was doing business on a secured basis. The arguments of Riverside's attorneys repeatedly refer to the Debtor being "out of trust." All this indicates to this Court that the parties thought they were conducting business on a secured basis when in fact they were not. Finally, what is clear from the testimony and Riverside's arguments is that Riverside is attempting to piggyback a secured relationship between itself and the Debtor from the secured relationship between Associates and itself. Such an industry practice is totally unheard of, in particular where a seller is providing big ticket items involving large sums of money, where the seller must wait for payment until the items are resold. In conclusion, while it is true that there are industry practices where payment is not due until a resale occurs, it is equally true that such a practice is in the context of a secured arrangement, such as trust receipt financing, where the creditor holds a security interest in the item itself and expects payment from the proceeds of the resale.

■ As to the other two categories of payments, Riverside takes the position that it gave new value and is protected by Section 547(c)(1). Turning to the second of these categories, the payment by Pearson of $6,771.64 for parts and labor provided to Debtor, the Trustee argues Pearson is a separate legal entity and received no value from a chassis delivered to Debtor. The

Trustee is correct, and as no new value was given to Pearson this defense fails.

■ Although not raised by Riverside, the Trustee's argument raises the issue of whether the $6,771.64 payment could be a preference in the first instance. As previously noted in this Opinion, in order for there to be a preference, there must be a transfer of an interest of the debtor in property. In this regard, the fundamental inquiry is whether the transfer diminished or depleted the debtor's estate, and generally a transfer by a third party that does not come from the debtor's property is not a preference. 4 *Collier on Bankruptcy*, para. 547.03 (15th ed. 1990). Where an obligation of the debtor is satisfied with property of a third party, or where the obligation which is satisfied is not owed by the debtor, there is no transfer which is subject to recovery under Section 547. *In re Taco Ed's, Inc.*, 63 B.R. 913 (Bkrtcy. N.D.Ohio 1986). The payment by Pearson to Riverside on July 21, 1989, in the amount of $6,771.64, was in payment of invoices numbers 26330 and 26295. (Trustee's Exhibit # 19.) Both of those invoices were billed to the Debtor. (Trustee's Exhibit # 19.) Pearson and the Debtor, though both in bankruptcy, are separate legal entities. The Trustee cannot recover the $6,771.64 payment to Riverside on behalf of either Debtor's estate because the Debtor's property was not used to make the payment and Riverside was not a creditor of Pearson.

■ The last category of payments involves the $8,406.96 paid by the Debtor to Riverside as reimbursement for interest paid by Riverside to Associates. Riverside argues that as it supplied an additional chassis to Debtor after it received the interest payment that a contemporaneous exchange for new value occurred.

This argument is defective because it is based solely on the chronology of events and the fact that Riverside supplied a chassis after receiving the interest payment. Section 547(c)(1) provides as follows:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

In discussing this section *Collier* states:

Thus, a transfer that would otherwise be considered preferential is insulated from attack by the trustee under section 547(c)(1), if: (i) the preference defendant extended new value to the debtor; (ii) both the defendant and the debtor intended the new value and reciprocal transfer by the debtor to be contemporaneous; and (iii) the exchange was in fact contemporaneous.

The sparse legislative history of section 547(c)(1) indicates that its purpose was to protect exchanges of property that might literally be considered credit transactions when the transactions were clearly intended to be contemporaneous transfers.

. . . .

Thus, transactions that appear at first glance to be a contemporaneous exchange for new value will not be so considered under section 547(c)(1)(A) absent a showing that the parties actually intended the exchange to be contemporaneous. For example, a vendor who conditions continued deliveries to the buyer on the buyer's payment of old invoices will not be protected by section 547(c)(1) from attack by the buyer's trustee, even though the buyer's payment to the vendor and the vendor's transfer of property to the buyer occurred contemporaneously. (Footnotes omitted).

4 *Collier on Bankruptcy*, para. 547.09 (15th ed. 1990).

Merely showing that Riverside transferred something of value, after the preference was received is insufficient to establish the new value defense. Riverside must show a correlation or connection between the preference payment and the shipment of the chassis which shows a contemporaneous exchange of one for the other, both in the context of intent and the actual act. Riverside failed in this regard.

As to the other two categories of payments, Riverside also argues that *it has* established a new value defense under Section 547(c)(4). That provision, known as the "subsequent-advance rule," provides:

(c) The trustee may not avoid under this section a transfer—

. . . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise avoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. Section 547(c)(4). In order for Section 547(c)(4) to apply, three elements must be satisfied: 1) the creditor must have extended new value to the debtor after receiving the preferential transfer; 2) the new value must be unsecured; and 3) the new value must remain unpaid after its transfer. *In re Ford*, 98 B.R. 669 (Bkrtcy. D.Vt.1989.)

Riverside contends that it can offset the value of the chassis it delivered to the Debtor on August 10, 1989, against the preferential payments received on July 21, 1989, and August 7, 1989. The chassis delivered to the Debtor on August 10, 1989, cannot offset a prior transfer from Pearson to Riverside. Moreover, this Court has held that the July 21, 1989, payment in the amount of $6,771.64 was not a preferential transfer and cannot be recovered by the Trustee. Riverside prevails, however, with respect to the August 7, 1989, payment of $8,406.96, made by Debtor to Riverside. That payment is protected by the subsequent advance rule.

### THE ISSUES RAISED BY RIVERSIDE'S REPOSSESSION AND SALE OF THE DEMONSTRATOR UNIT TO BIOPLUS

The Trustee's preference action is to recover the value of the demonstrator unit sold by Riverside to Bioplus. For the reasons stated earlier in this Opinion, this

Court holds that the Debtor had an interest in the demonstrator unit Riverside sold to Bioplus. Riverside's argument that it had loaned the chassis to the Debtor to use as a demonstrator, and as the chassis was still Riverside's, there was no transfer of the Debtor's interest in the property, is without merit. The evidence did not establish that Riverside had loaned the chassis to the Debtor to use as a demonstrator. The evidence was that the chassis had been delivered to the Debtor on the same basis as the other chassis, and that the Debtor had improved it and had decided to use it as a demonstrator, and then as a loaned unit to Bioplus.[1]

■ But, even if it was on a loaned status from Riverside to the Debtor, the Debtor's right to use it in this fashion is an interest in property, as that term is a very broad one, which 4 *Collier on Bankruptcy*, para. 547.03, states "is as broad as possible."

Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody or control even if there is no transfer of title, because possession, custody, and control are interests in property. (Footnotes omitted.)

■ The next is sue is whether there was a transfer of the Debtor's interest. Section 101(54) defines that term to mean:

"transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption;[2]

This term likewise is broad in nature. *See In re Vogue Coach Co., supra,* and 1 *Collier on Bankruptcy*, para. 101.54(a) (15th ed. 1989). In the case before this Court,

Riverside's action of exercising control over the Debtor's interest in the demonstrator unit and selling it to Bioplus for $38,500.00 without the Debtor's knowledge or consent, constituted an involuntary disposition (as to the Debtor) of the Debtor's interest.

Riverside, in the alternative, argues that as the chassis was subject to the Associates lien, the Trustee is limited to the Debtor's equity of $2,083.37. That argument has previously been considered and rejected.

■ Riverside, also in the alternative, next argues that the Trustee's claim is limited to the $38,200.00 Riverside obtained from Bioplus and that the Trustee can recover the value of the improvements from Bioplus. Riverside's contention that it sold only the chassis to Bioplus and not the improvements is ludicrous. The improvements were an integral part of the unit and without them the unit was useless to Bioplus. While it is true that the Debtor's chief officer testified the improvements could be removed, it is absurd to suggest that that is a viable course of action. While physically possible, removal would adversely affect the remaining chassis. For it must be remembered, that the chassis was also altered in order to accept the improvements. This is clear from an examination of the picture of the modified unit. (Defendant's Exhibit 16.) Additional support for this conclusion can be found in the way that Riverside treated the unit. If the improvements were so readily removable, why did not Riverside remove them and sell just the chassis? The answer is that they were an integral part of the chassis and the altered chassis had less value to Riverside and no value to Bioplus. To get the $38,200.00 from the chassis, Riverside had to

1. This conclusion is supported by the fact that Michael Gibbons, the former president of both the Debtor and Pearson, testified that, in desperation, he attempted to sell the unit to Bioplus himself.

2. [W]ith the enactment of Pub.L. No. 101–647, an error exists in the numbering of paragraphs at the end of section 101. Prior to the enactment of Pub.L. No. 101–647, Pub.L. No. 101–311 (An Act to Amend Title 11 of the United States

Code Regarding Swap Agreements and Forward Contracts), which was enacted on June 25, 1990, had added four paragraphs to section 101 and redesignated other paragraphs, resulting in the last paragraph of the section being redesignated as paragraph (57). Because the drafters of Pub.L. No. 101–647 did not take into account the redesignation of paragraphs by Pub.L. No. 101–311, section 101 now contains two each of numbered paragraphs (54) through (57).

sell a completed unit. The improvements were accessions to the chassis and the two had become a single unit. *See Matter of Aztec Concrete, Inc.*, 136 B.R. 535 (Bkrtcy. S.D.Iowa 1992); *In re Lyford*, 22 B.R. 222 (Bkrtcy.D.Maine 1982). By delivering the Manufacturer's Statement of Origin to Bioplus, Riverside enabled Bioplus to transfer ownership to the completed unit to a third party, which it in fact later did. For purposes of Section 547, the transfer to Riverside was the completed unit, not simply the chassis.[3]

Nor is the Trustee required in seeking a recovery of a preference to sue Bioplus. When a transfer is avoided pursuant to Section 547, the trustee may recover the value of property transferred from either the initial transferee or any mediate or immediate transferee of the initial transferee under Section 550(a) of the Bankruptcy Code. 11 U.S.C. Section 550(a). *In re Aldridge*, 94 B.R. 589 (Bkrtcy.W.D.Mo.1988.) While some courts have refused to give Section 550(a) a literal application when it would permit the trustee to recover from a party who is innocent of wrongdoing and deserves protection, that judicially carved exception would not be applicable here, even if this Court would choose to follow it. *See Aldridge, supra; Matter of R.A. Beck Builder, Inc.*, 34 B.R. 888 (Bkrtcy.W.D.Pa.1983). It was Riverside which initiated the transfer by exercising control over the demonstrator unit and selling the unit to Bioplus. It caused the damage and it cannot avoid its responsibility by attempting to transfer it to Bioplus. Nor is there an express or implied right to contribution in the Bankruptcy Code. *Wieboldt Stores, Inc. v. Schottenstein*, 111 B.R. 162 (N.D.Ill.1990).

The next issue involving the Bioplus Unit is its value for preference purposes. The Trustee is seeking $92,000.00 which he asserts is the value of the Debtor's interest in the unit. Riverside's brief is silent on this point. The Trustee's own witness testified that the unit had a value of somewhere between $85,000.00 and $92,-000.00. However, that price equates to the value of a new unit, and the unit in question was used and did not meet Bioplus' specifications. Furthermore, when the unit was transferred to Bioplus as a loaner, the Debtor placed a value of $79,550.00 on it. (Bioplus' exhibit # 2). Therefore, this Court finds that the value of the used demonstrator unit that had been loaned to Bioplus was $79,550.00.

The Trustee argues that Riverside's actions with respect to the Bioplus unit constitute a conversion and he seeks leave to amend the pleadings to conform to the evidence. In response, Riverside argues that conversion was not pled and that to go forward on that theory would be inappropriate as Riverside has not had an opportunity to defend on the theory of conversion. The first mention of conversion was made in the Trustee's brief filed on the morning of trial. While he also referred to this theory in his opening statement, the evidence which the Trustee claims supports his conversion theory was also relevant to his preference case. On the record before this Court, it is not clear whether Riverside had any additional evidence it could have presented on the conversion theory. This Court views it unnecessary to rule on the Trustee's motion as he prevails upon his preference theory.

Riverside has filed a third party complaint against Bioplus, claiming that if Riverside is liable to the Trustee for the value of the improvements made to the chassis, that it is entitled to indemnification and/or contribution from Bioplus. Bioplus has asserted a cross-claim against the Trustee, seeking recoupment of the $21,000.00 downpayment it made in the event that Riverside prevails on its claim against Bioplus. At trial, Bioplus introduced evidence of lost profits and now claims recoupment damages in the amount of $101,129.76.

---

3. While it is true that for preference purpose, the transfer must be on account of an antecedent debt, the Debtor was indebted, at the time of the transfer of the Bioplus unit, to Riverside for the amount of the Bevill unit. Thus the amount of the transfer did not exceed the amount of the indebtedness to Riverside. Riverside has filed a claim in the main case proceedings in the amount of $43,388.18.

Under the doctrine of recoupment, a creditor may offset a claim that "arises from the same transaction as the debtor's claim" without the limitations of Section 553 of the Bankruptcy Code. *In re Davidovich*, 901 F.2d 1533 (10th Cir.1990). In a previous opinion this Court noted the doctrine of recoupment has primarily been applied by the bankruptcy courts where the claims arise out of the same contract. *In re McCoy*, 65 B.R. 673 (Bkrtcy.C.D.Ill. 1986). The Trustee contends that Bioplus' claim for lost profits and the down payment do not arise out of the same transaction as the Trustee's preference claim for the transfer of the demonstrator unit. This Court agrees. Bioplus' contract with the Debtor was for a Caterpillar unit which the Debtor was unable to timely fulfill, resulting in Debtor loaning Bioplus the demonstrator unit to use. In an entirely separate transaction which did not involve the Debtor, Riverside sold the demonstrator unit to Bioplus. As the court in *In re Davidovich, supra*, noted, merely because the same two parties and the same subject matter are involved in the claims to be offset does not mean that the two claims arose from the same transaction. Moreover, because the doctrine of recoupment must involve reciprocal claims, "triangular" set-offs are precluded. *See Matter of Elcona Homes Corp.*, 863 F.2d 483 (7th Cir.1988). Bioplus cross-claim for recoupment must be denied.

This was a complicated case. The Court was not fully aware of the facts and the theories of the case until it was tried. However, it is the duty of this Court to inquire into its own jurisdiction, whether or not the question is raised. *In re Calloway*, 70 B.R. 175 (Bkrtcy.N.D.Ind.1986); *In re Howard Nat. Corp.*, 70 B.R. 278 (N.D.Ill.1987). It is fundamental that the bankruptcy court, like other federal courts, is a court of limited jurisdiction. *Calloway, supra*. The outermost confines of this Court's jurisdiction are those disputes which are "related to" the bankruptcy. 28 U.S.C. Section 157(c)(1). As defined by the Seventh Circuit, a dispute is only "related to" the bankruptcy if its resolution "affects the amount of property available for distribution or the allocation of property among the creditors." *Matter of Xonics, Inc.*, 813 F.2d 127 (7th Cir.1987). Judge Easterbrook, in *Matter of Kubly*, 818 F.2d 643 (7th Cir.1987), later amplified its ruling:

> *In re Xonics, Inc.*, 813 F.2d 127 (7th Cir.1987), holds that disputes among creditors of a bankrupt come within the federal bankruptcy jurisdiction only if they involve property of the estate or if resolving two creditors' intramural squabble will affect the recovery of some other creditor. (Citations omitted)
>
> . . . .
>
> Like other federal courts, a bankruptcy tribunal is one of limited jurisdiction. Its power must be conferred, and it may not be enlarged by the judiciary because the judge believes it wise to resolve the dispute. Congress provided for the "comprehensive administration of bankruptcy cases", but we must establish independently that a dispute is part of a *bankruptcy* case; the existence of power within the bankruptcy case does not imply an expansion of jurisdiction beyond it. To the contrary, it suggests that courts must be particularly careful in ascertaining the source of their power, lest bankruptcy courts displace state courts for large categories of disputes in which some party (or here, some party's stockholders) may be bankrupt. We held in *Xonics* that the "related to" jurisdiction encompasses only disputes that affect the payments to the bankrupt's other creditors or the administration of the bankrupt's estate.

As noted by the court in *In re Pettibone Corp.*, 135 B.R. 847 (Bkrtcy. N.D.Ill.1992), bankruptcy courts frequently lack "related to" jurisdiction to hear third-party complaints which arise from adversary proceedings. In *In re John Peterson Motors, Inc.*, 56 B.R. 588 (Bkrtcy.D.Minn. 1986), a case similar to the present one, the court held that it lacked jurisdiction over a third-party complaint seeking indemnity or contribution from a nondebtor brought by a defendant in a preference action. The court in *Pettibone* stated that where such cross-claims or third-party complaints involve a dispute between non-debtors which

will merely determine which party will ultimately be responsible in the event that one of the nondebtors is found liable in the underlying adversary proceeding, jurisdiction is lacking. *See In re K & R Min., Inc.*, 135 B.R. 269 (Bkrtcy.N.D.Ohio 1991); *In re German*, 97 B.R. 373 (Bkrtcy. S.D.Ohio 1989). That is true here regarding the third-party complaint filed by Riverside. It must be dismissed.

██ The Trustee is also seeking court costs. The Trustee is entitled to his costs. However, he needs to request costs in accordance with Rule 54(d) of the Federal Rules of Civil Procedure, bankruptcy rule 7054, and local rule 2.14 of the Rules of the U.S. District Court for the Central District of Illinois. When his request is made in accordance with those rules, it will be considered further.

██ The Trustee is also seeking pre-judgment interest. Under this Court's previous decision in *Industrial & Municipal Engineering, Inc.*, 127 B.R. 848 (Bkrtcy. C.D.Ill.1990), the Trustee is entitled to interest on the preferential transfers. In that prior decision, this Court followed the majority rule which favors pre-judgment interest in preference actions. This Court has applied that rule in many cases since that decision. An award of interest accrues from the date of the demand, or from the date of the commencement of the adversary proceeding. Because there was no evidence of a demand earlier than the bringing of this action, the Trustee is entitled to pre-judgment interest on the sum of $389,173.00 from July 2, 1990, the date this proceeding was filed.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ORDER

For the reasons set forth in the Opinion entered this day;

IT IS, THEREFORE, ORDERED:

1. That judgment is entered in favor of the Defendant, RIVERSIDE INTERNATIONAL TRUCKS, INC., and against the Plaintiff, RICHARD E. BARBER, Chapter 7 Trustee for PEARSON INDUSTRIES, INC., in Adversary No. 90–8119.

2. That judgment is entered in favor of the Plaintiff, RICHARD E. BARBER, Chapter 7 Trustee for INDUSTRIAL & MUNICIPAL ENGINEERING, INC., and against the Defendant, RIVERSIDE INTERNATIONAL TRUCKS, INC., in the amount of $389,173.00, from July 2, 1990, at the rate of 8.09%, through July 31, 1992.

3. The third party complaint filed by RIVERSIDE INTERNATIONAL TRUCKS, INC. against the third party defendant, BIOPLUS MANUFACTURING, INC., is dismissed for lack of jurisdiction.

4. The Crossclaim for Recoupment filed by BIOPLUS MANUFACTURING, INC., against RICHARD E. BARBER, Chapter 7 Trustee for INDUSTRIAL & MUNICIPAL ENGINEERING, INC., is DENIED.