75 F.3d 1447
 28 Bankr.Ct.Dec. 668, Bankr. L. Rep. P 76,906
 In re AMDURA CORPORATION; Amdura National Distribution
Company, formerly known as FOK; Coastamerica Corporation;
Coast to Coast Holdings, Inc.; Coast to Coast Stores, Inc.;
Intertrade Cargo, Inc., Debtors,
AMDURA NATIONAL DISTRIBUTION COMPANY, formerly known as FOK,
Plaintiff-Appellant,
v.
AMDURA CORPORATION, INC., Defendant-Appellee.
 No. 94-1292.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 5, 1996.
 
 Appeal from the United States District Court, for the District of Colorado, (D.C. No. 93-B-2044).
 Steven E. Abelman, Berryhill, Cage and North, Denver, Colorado (Albert Solochek, Howard, Solochek & Weber, Milwaukee, Wisconsin with him on the briefs), for appellant.
 David M. Bennett, Thompson & Knight, Dallas, Texas (James R. Prince, Thompson & Knight, Dallas, Texas and Merrie Margolin Kippur, McKenna & Cuneo, Denver, Colorado with him on the brief), for appellee.
 Before LOGAN and HENRY, Circuit Judges, and ELLISON,* District Judge.
 HENRY, Circuit Judge.
 
 
 1
 The sole issue in this bankruptcy appeal is the ownership of funds deposited by a subsidiary into a parent corporation's cash management bank account. We affirm summary judgment for the parent.
 
 Background
 
 2
 Amdura National Distribution Company (Andco) was a hardware distributor, one of three wholly owned subsidiaries of Amdura Corporation (Amdura), which was a holding company with few assets of its own. Amdura's other subsidiaries were The Crosby Group, Inc., and The Harris Waste Management Group, Inc. Amdura provided management, accounting, and financial services to its subsidiaries.
 
 
 3
 As part of its cash management system, Amdura took the receipts of its subsidiaries each day, concentrated them in a single account (the "concentration account") held solely in its name, and then paid the subsidiaries' expenses from that account. In Andco's case, money from Andco's customers went into lockbox accounts held solely in Andco's name. The banks where these accounts were located were under standing instructions to transfer the entire contents of the lockbox account to Amdura's concentration account each day. The other subsidiaries also used a similar arrangement to transfer their receipts to the Amdura account. Thus, the receipts from Andco were commingled with the daily receipts from the other subsidiaries, although Amdura kept records of how much each subsidiary deposited and how much was spent on the operating expenses of each subsidiary. Amdura recorded all monies received in the concentration account from a lockbox account as a debt owed by Amdura to the subsidiaries; monies expended from the concentration account on behalf of a subsidiary were recorded as a debt owed by the subsidiary to Amdura. On any given business day, the balance owed by Amdura to a subsidiary (and vice versa) would therefore increase or decrease depending upon whether the amounts transferred from the subsidiary to the concentration account were greater or less than the amounts Amdura advanced on behalf of that subsidiary.
 
 
 4
 This arrangement gave Amdura complete control over the funds in the concentration account. Amdura paid its subsidiaries' obligations without regard to how much cash a particular subsidiary had deposited into the account. Additionally, Amdura used the account for its own deposits and withdrawals, and all interest accrued on the account went to Amdura.
 
 
 5
 In 1988, Amdura acquired Coast America Corporation and its subsidiaries (Coast). In order to obtain capital for the purchase, Amdura borrowed over $200,000,000 from a group of bank lenders led by Continental Bank, N.A. (the Bank Group). Amdura pledged as security its own accounts receivable, the accounts receivable of Andco and Coast, the cash in the concentration account, and Amdura's equity interest in Andco and Coast.
 
 
 6
 On April 2, 1990, Amdura, Andco, and Coast filed bankruptcy petitions. (Neither Harris nor Crosby sought bankruptcy protection and continued to operate during the bankruptcy proceedings.) According to Amdura's ledger records, the concentration account contained approximately $3,625,557.63 on the petition date, of which $1,719,002.92 was derived from Andco.
 
 
 7
 After the petition date, the debtors sought immediate bankruptcy court approval to use the funds in the concentration account, in which the Bank Group claimed a security interest, to pay the operating expenses of Amdura and its subsidiaries. On April 6, 1990, retroactively effective April 4, 1990, the bankruptcy court issued the first of several orders authorizing the debtors to use the concentration account funds to operate their respective businesses. In its order, the bankruptcy court specified that the use of one debtor's funds for the benefit of another should give rise to an account receivable owed by the benefitted entity:
 
 
 8
 To the extent that Cash Collateral of AMDURA Corporation is used for the benefit of Subsidiary Non-Debtors, such use will give rise to an account(s) receivable owed by the Subsidiary Non-Debtors to AMDURA Corporation. To the extent that Cash Collateral is used by a debtor entity other than that entity which owns the Cash Collateral, such use will also give rise to an account(s) receivable owed by the debtor entity which used the Cash Collateral to the entity which owned the Cash Collateral.
 
 
 9
 Aplee's Supp.App. at 2. The bankruptcy court allowed use of the funds only to the extent necessary to keep the subsidiaries in operation, devised a budget for such expenditures, and set an absolute limit for total expenditures. The court also granted the Bank Group a first and senior lien and security interest (plus an administrative priority claim) upon the post-petition accounts receivable of all the debtors to the extent that the value of the accounts receivable was diminished by their use in operating the businesses.
 
 
 10
 At the same time, having learned of the bankruptcy petition, certain banks where Coast and Andco maintained lockbox accounts had begun to disregard these subsidiaries' orders to transfer funds to the concentration account. On April 10, 1990, Amdura, Andco, and Coast filed an "emergency motion" to direct the banks to resume transfer of the funds. This motion asserted that approximately $2,800,000 of the cash collateral previously authorized for use had been frozen in the subsidiaries' lockbox accounts, although that amount was not broken down by subsidiary. The record is silent as to whether this motion was granted. However, Andco continued in business and did not establish a separate bank account until May 25, 1990, almost two months into the bankruptcy case.
 
 
 11
 Upon further petitions by the debtors, the bankruptcy court issued further orders on April 12, April 18, and April 25, authorizing continued use of the collateral for additional periods. The April 25 order provided that "none of the Cash Collateral of the Debtor may be utilized by the other debtors in these jointly administered cases or by the non-debtor subsidiaries of AMDURA Corporation." On May 17, the bankruptcy court issued another order authorizing continued use pending a final hearing. On May 23, the court issued a final order authorizing continued use indefinitely, contingent upon continued approval of the parties and fulfillment of reporting requirements by the debtors.
 
 
 12
 Pursuant to the cash collateral orders, Amdura advanced approximately $1,670,000 for Andco's operating expenses within the first two months after the petition was filed. In May 1990, Andco paid approximately the same amount back into the concentration account.
 
 
 13
 In June 1991, the bankruptcy court approved a joint plan of reorganization with respect to Amdura. The court approved the plan with respect to Andco six months later, in January, 1992. Under the terms of the plan, the Bank Group was entitled to $4,000,000 of the money in the concentration account. The Bank Group settled with the debtors in agreements finalized on February 26 (the Andco agreement) and March 9, 1992 (the Coast agreement). Under these agreements, Andco and Coast released their claims to the funds in the concentration account. Coast released its claims entirely; Andco released its claims only up to $3,800,000, based on the balance in the account as of November 29, 1991. On that date, the balance in the account was $4,847,875.
 
 
 14
 Andco then filed this complaint in bankruptcy court on March 18, 1992. Relying on 11 U.S.C. § 542, it sought turnover of the concentration account's remaining $1,047,875 and an injunction to prevent Amdura's use of that money to pay its creditors. It proceeded under two theories. First, it argued that it owned the funds outright. Second, it argued that for various reasons it was entitled to have a constructive trust imposed on the funds.
 
 
 15
 The bankruptcy court declined to issue an injunction, and the district court denied leave to appeal on the issue. Amdura and Andco then filed cross-motions for summary judgment. The bankruptcy court held that there were no disputed material facts, that the funds were part of the Amdura estate, that Andco was not entitled to a constructive trust, and that Amdura was therefore entitled to summary judgment. The district court affirmed. See In re Amdura Corp., 167 B.R. 640 (D.Colo.1994). Andco now appeals.
 
 DISCUSSION
 
 16
 Andco first argues that the bankruptcy court erred in granting summary judgment because Andco is entitled to the disputed funds in the concentration account--either because it owned the funds outright or because it is entitled to the funds under a constructive trust theory. We review the grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir.1991).
 
 
 17
 We begin, as did the district court, by noting that Andco must prove with clear and convincing evidence that the disputed funds are the property of Andco's bankruptcy estate. See Amdura, 167 B.R. at 644. We presume that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established. See 4 Collier on Bankruptcy p 541.11, at 541-75 (15th ed. 1995). Andco urges that this presumption should not apply because Amdura treated contributions to the concentration account as belonging to Andco. In addition, Andco points to the language of the bankruptcy court's April 25 order, which refers to the debtor subsidiaries' contributions as the cash collateral of those subsidiaries.
 
 
 18
 In this case the concentration account was not only held exclusively in Amdura's name, but Amdura also possessed all other legally cognizable indicia of ownership. None of the money in the account was ever segregated; Amdura had, at least pre-petition, the right to spend the money entirely as it saw fit without concern for "whose money" it was spending; and Amdura in fact spent concentration account funds on its own obligations as well as those of the subsidiaries. Even if the parties' own characterization of the account were binding on this court, the record reveals no statements that controvert the existence of these rights of ownership. The same is true of the April 25 bankruptcy order, which, although establishing a new regimen of controls on the account, did not purport to settle the ownership question. We conclude that Andco did not own outright any part of the concentration account.
 
 
 19
 In the alternative, Andco advances three arguments in favor of imposing a constructive trust on the disputed funds in the concentration account. First, Andco argues that Amdura was a mere agent for Andco. Second, Andco argues that Amdura abused a confidential relationship with Andco, resulting in unjust enrichment. Third, Andco argues that the "trust fund" doctrine should apply. None of these theories justifies reversal.
 
 
 20
 Andco begins its agency argument by asserting that Amdura was in the habit of paying Andco's bills when Andco "instructed" it to do so. Andco concludes from this fact that Amdura's control over the concentration account was a "power ... exercise[d] solely for the benefit of an entity other than the debtor" so that the disputed funds are not part of Amdura's estate. See 11 U.S.C. § 541(b). Although it is conceivable that a parent corporation could be an agent of its wholly owned subsidiary, Andco has not shown that to be true in this case. The record reflects no evidence that Amdura was ever contractually or otherwise compelled to pay Andco's debts. The fact that Amdura usually did so is not enough to establish that its control over money from Andco was exercised solely for Andco's benefit. See Montano v. Land Title Guarantee Co., 778 P.2d 328, 331 (Colo.Ct.App.1989) (holding that there is no agency relationship where the alleged agent is not subject to the control of the alleged principal).
 
 
 21
 Andco next contends that Amdura's confidential relationship with Andco justifies the imposition of a constructive trust. "A constructive trust is an equitable remedy devised to prevent unjust enrichment and compel restitution of property that in equity and good conscience does not belong to the Defendant." In re Western Urethanes, Inc., 61 B.R. 243, 245 (Bankr.D.Colo.1986) (quoting In re Specialized Installers, Inc., 12 B.R. 546, 553 (Bankr.D.Colo.1981)). The bankruptcy court found that no confidential relationship existed. The district court concluded that a reasonable inference may be drawn that one existed, but that there was no unjust enrichment or other abuse of the relationship to justify the imposition of a constructive trust. Amdura, 167 B.R. at 646.
 
 
 22
 There is nothing in the record to support Andco's suggestion that the transfer of lockbox funds into the concentration account, at all other times a routine procedure, became on the eve of bankruptcy an attempt to plunder Andco's corporate assets. Nor is there evidence of other misbehavior on Amdura's part. In a similar case involving a cash management account held by a parent corporation, the Fifth Circuit has recently held that a constructive trust was not justified in the absence of actual fraud or breach of duty by the parent. In re Southmark Corp., 49 F.3d 1111, 1118-19 (5th Cir.1995) (applying Texas law).
 
 
 23
 We look to state law--in this case, the law of Colorado--to determine when the constructive trust doctrine applies. See In re Woodcock, 45 F.3d 363, 366 (10th Cir.) (noting that "property interests of the parties to a bankruptcy proceeding are 'created and defined by state law' " (quoting Butner v. United States, 440 U.S. 48, 54-55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979))), cert. denied, --- U.S. ----, 116 S.Ct. 97, 133 L.Ed.2d 52 (1995); In re Osborn, 24 F.3d 1199, 1203 (10th Cir.1994) (same); In re Lee, 126 B.R. 978, 983 (Bkrtcy.S.D. Ohio 1991) ("State law controls the determination of whether or not the estate has an interest in the property for which turnover is sought."). Colorado does not require actual fraud in order to impose a constructive trust. Western Urethanes, 61 B.R. at 246. However, some kind of abuse or unjust enrichment must be shown, Mancuso v. United Bank of Pueblo, 818 P.2d 732, 737 (Colo.1991) (en banc), and it is up to the plaintiff to show it, see Page v. Clark, 592 P.2d 792, 798 (Colo.1979) (en banc). Andco cannot meet that burden merely by imputing evil intent to a business arrangement in which it willingly participated and to which it did not object prior to filing for bankruptcy. We conclude that the imposition of a constructive trust would have exceeded the limits of the bankruptcy court's equitable powers "by creating substantive rights that otherwise would not have existed." Southmark, 49 F.3d at 1116.
 
 
 24
 Andco's third justification of a constructive trust is the trust fund doctrine. As enunciated in United States v. Van Diviner, 822 F.2d 960 (10th Cir.1987),
 
 
 25
 Under the trust fund doctrine, the assets of an insolvent or dissolved corporation constitute a trust fund for the benefit of creditors, and an equitable action may be brought against a stockholder or distributee when the assets of the dissolved or insolvent corporation are distributed without affording an opportunity for creditors to present and enforce claims.
 
 
 26
 Id. at 965 (emphasis added.) Andco contends that it was the insolvent corporation whose assets Amdura "distributed" to itself pre-petition without affording Andco's creditors an opportunity to enforce their claims.
 
 
 27
 The parties disagree over whether state law or federal law controls the question of whether the trust fund doctrine should apply. We need not reach that issue. The trust fund doctrine applies, if at all, only where creditors do not otherwise have an opportunity to enforce their claims against the insolvent corporation. See id. In this case, Amdura's bankruptcy proceeding gave Andco the chance to recover the disputed funds as an unsecured creditor, and Andco's own bankruptcy proceeding gave Andco's creditors a chance to present and enforce their claims against Andco. While this arrangement may result in Andco's creditors receiving less than all of the disputed funds, it still constitutes an opportunity for those creditors to "present and enforce" their claims.[2] Thus, the trust fund doctrine does not apply.
 
 
 28
 Andco finally contends that a genuine dispute existed, precluding summary judgment, as to the location of at least some of the disputed funds on the date the bankruptcy petition was filed. In support of its claim, Andco points to the April 10 emergency motion filed by Andco, Amdura, and Coast. The allegations contained in that motion, if true, establish that there were funds in Andco's lockbox accounts after the petition date. As we have noted, we are unable to determine from the record whether this motion was granted. However, if the bankruptcy court granted the motion, then the funds in Andco's lockbox accounts would have ended up in the concentration account after the petition date. Andco also points to testimony by Ed Rand, a former Amdura executive, indicating that some of the cash identified as Amdura's on the petition date was cash that had not yet been transferred to Amdura from the subsidiaries. Moreover, as noted above, Andco did not open its own money management account for over two months after the petition date, but continued to do business. Construing all this evidence in Andco's favor, it must be concluded that some of the monies in the concentration account were transferred there after the petition date. Andco argues that any such postpetition transfer of its funds should be voidable, and that a hearing is necessary to determine the amount of such transfers.
 
 
 29
 The district court held that Andco had effectively conceded the question of the size of the concentration account on the petition date by using Amdura's figures in its motion for summary judgment. The district court reasoned further that once ownership of the concentration account was established, the amount of money in the account on the petition date became irrelevant. Amdura, 167 B.R. at 644. This latter conclusion, which Andco describes as "bizarre," in fact accurately reflects the reality of the financial relations between Andco and Amdura.
 
 
 30
 To the extent that postpetition transfers from Andco to Amdura did occur, they appear to have been no more than a continuation of the routine transactions necessitated by the cash management system the companies had adopted. A debtor in possession under Chapter 11 is generally authorized to continue operating its business. See 11 U.S.C. §§ 363(c)(1), 1107, 1108; Las Vegas Ice & Cold Storage Co. v. Far W. Bank, 893 F.2d 1182, 1188 (10th Cir.1990). The freedom to continue operation includes the freedom to obtain unsecured credit and to incur unsecured debt in the ordinary course of business. 11 U.S.C. § 364(a); Las Vegas Ice, 893 F.2d at 1188. The emergency motion itself, to which Andco was a party, describes the requested transfers as consonant with standing instructions regarding the lockbox accounts. Nor is there any suggestion that either Andco or Amdura effected the transfers in order to prejudice the rights of their creditors. We therefore conclude that on these facts any postpetition transfers did not "transcend[ ] the day-to-day affairs" of either Andco or Amdura, see In re Buyer's Club Markets, Inc., 5 F.3d 455, 458 (10th Cir.1993), and hold that summary judgment for Amdura on this issue is appropriate.
 
 
 31
 We therefore AFFIRM the judgment of the district court.
 
 
 
 *
 Honorable James O. Ellison, Senior District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation
 
 
 [2]
 This result is obviously more favorable to Amdura's creditors than to Andco's. It is the nature of bankruptcies to result in hardship even as they seek to fairly allocate scarce assets under the law in order to reflect policies accepted by Congress. Here, because Amdura wholly owned Andco and because Andco cannot avail itself of the equitable remedies it seeks, this result is compelled