### In re ROCOR INTERNATIONAL, INC., Debtor.

Rocin Liquidation Estate, successor in interest to Rocor International, Inc., debtor and debtor-in-possession, Plaintiff,

v.

Alta AH & L, Defendant.

Bankruptcy No. 02–17658 WV.
Adversary No. 04–1317–WV.

United States Bankruptcy Court,
W.D. Oklahoma.

Sept. 29, 2006.

Nicholas A. Franke, Esq., David M. Brown, Esq., Patrick T. McLaughlin, Esq., St. Louis, MO., for Plaintiff.

Willliam H. Hoch, Esq., Oklahoma City, OK, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

T.M. WEAVER, Chief Judge.

This matter came on for trial on the adversary complaint of the plaintiff, Rocin Liquidation Estate (the "Estate"), seeking avoidance of certain alleged preferential transfers and recovery of their monetary value. The transfers in question were payments made by the debtor Rocor International, Inc. ("Rocor" or "debtor") to the defendant, Alta AH & L ("Alta") for the purpose of providing health benefits for independent contractors engaged by the debtor to haul freight. For the reasons herein stated, the court concludes that the payments are avoidable in part.

Following the presentation of witnesses and exhibits in open court, the court granted leave to permit counsel to designate as evidence portions of certain deposition testimony and to file post-trial briefs on evidentiary issues. Thereafter, closing arguments were presented, after which the court took the matter under advisement.

Now, having considered the evidence, arguments of counsel and the applicable law, the court issues the following findings of fact and conclusions of law in accordance with FED.R.CIV.P. 52, which is made applicable to this proceeding by FED. R.BANKR.P.7052.

### Jurisdictional Statement

This court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 157 and 1334 and the order of the District Court autho-

rizing referral of proceedings to the bankruptcy judges. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and, to the extent the proceeding may be non-core, the parties have consented to the entry of final judgment by this court.

### Findings of Fact

1. On August 5, 2002 (the "petition date"), Rocor filed its voluntary chapter 11 bankruptcy petition.

2. On July 24, 2003, the bankruptcy court confirmed the Debtor's First Amended Plan of Liquidation. The Estate was created pursuant to the Plan of Liquidation and confirmation order, and all rights and causes of action previously held by the debtor vested in the Estate. Thus, the Estate has authority to pursue this and all other actions that could have been pursued by the debtor.

3. Within ninety (90) days prior to the petition date (the "preference period"), Alta received the following transfers from the debtor, which total $126,797.81:

| Wire Transfer | 5/7/02 | $ 5,977.49 |
| Wire Transfer | 5/14/02 | $33,336.48 |
| Wire Transfer | 5/21/02 | $10,674.24 |
| Wire Transfer | 6/4/02 | $ 4,124.09 |
| Wire Transfer | 6/11/02 | $41,574.06 |
| Wire Transfer | 6/18/02 | $ 5,935.91 |
| Check | 6/21/02 | $ 7,044.11 |
| Wire Transfer | 6/25/02 | $14,241.33 |
| Check | 6/26/02 | $ 2,914.60 |
| Wire Transfer | 7/9/02 | $ 975.50 [1] |

See Final Pretrial Order, Stipulated Fact 2.

4. Each of the above transfers was paid from funds on deposit in the debtor's account number 209037536 at Bank of Oklahoma, N.A., entitled "Rocor International Control Disbursement Account" (the "Account"). See the Estate's Exhibit 2 which was identified in the Final Pretrial Order as " 'Bank of Oklahoma Records Relating to Rocor International, Inc.,' (May through August of 2002)." The court's review of this exhibit reveals that these transfers were but a few of thousands of transfers drawn on the Account during the 90–day preference period.

5. The defendant is a creditor of the debtor.

6. The debtor was insolvent during the entire ninety (90) day period preceding the petition date.

7. In November of 2000, Rocor and Alta entered into two insurance contracts: a self-funded health insurance contract (the "Minimum Premium Payment Plan") and a life and accident insurance contract ("Life Insurance Contract"). (The Minimum Premium Payment Plan and the Life Insurance Contract are referred to collectively as the "Plan").

8. The Plan was established for the benefit of truckers ("owner-operators") engaged by the debtor to haul freight and who were independent contractors and not employees of the debtor.

9. The Plan was funded by Rocor's deduction from compensation otherwise due to the owner-operators who were participating in the plan (the "Plan participants") those sums required to pay premiums and other amounts due under the Plan (collectively, the "Plan payments"). The Plan payments were then made to Alta by Rocor by wire transfers from, and checks drawn on, the Account.

10. Under the Minimum Premium Payment Plan, Alta provided claims paying and administrative services and stop-loss insurance for the Plan participants.

---

**1.** As later noted, this amount is the slightly miscalculated difference between a wire transfer of $16,959.03 made on July 9, 2002 and a partial charge back of $15,980.03. While the actual difference is $979.50, the erroneous calculation has a *de minimus* effect.

11. Pursuant to the terms of the Minimum Premium Payment Plan, Alta paid health care claims of Plan participants ("health claims") directly to the health care providers.

12. While the terms of the Minimum Premium Payment Plan provided for payment within 10 days after billing, in actual practice, Alta initiated a weekly wire transfer by accessing the Account. With exceptions hereafter noted, Rocor made funds available to cover the wire transfers so that Alta would receive reimbursement of the health claims it had paid.

13. The reimbursements were made each Tuesday, and covered health claims Alta had paid during the previous week.

14. During the 90–day preference period, Rocor paid $116,839.10 [2] to Alta by the weekly wire transfers under the Minimum Premium Payment Plan for reimbursement of health claims paid to providers by Alta on behalf of Plan participants.

15. In addition, under the Minimum Premium Payment Plan, Alta provided stop-loss insurance. This stop-loss insurance protected Plan participants from health claims in excess of a pre-determined amount.

16. Under the Life Insurance Contract, in exchange for Rocor's making monthly premium payments, Alta provided life and accident insurance for Plan participants.

17. During the 90–day preference period, Alta received two checks from Rocor in the respective amounts of $7,044.11 and $2,914.60 for premium payments and fees due under the Life Insurance Contract.

18. Rocor did not transfer nor segregate any funds in connection with the deduction from compensation due the owner-operators for Plan payments. Rocor merely made an accounting entry to reflect the amount of the deduction.

19. All Plan payments made to Alta were from unrestricted funds on deposit in the Account of Rocor at Bank of Oklahoma.

20. The Minimum Premium Payment Plan agreement specifically provided that the insureds were independent contractors and their dependents.

21. The Plan was in effect at all times pertinent to this adversary proceeding.

22. Rocor's owner-operators were provided with a booklet describing the Plan as having been established under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001 *et seq.* See Defendant's Exhibit 15.

23. The requests for group coverage submitted by Rocor to Alta, however, specified that those eligible to participate in the Plan were independent contractors. See Defendant's Exhibits 1 and 8.

24. All of the Plan participants were independent contractors of Rocor and not employees.

25. During the preference period, certain of the wire transfers from Rocor's Account which Alta attempted were not successful because of a lack of sufficient funds on deposit in the Account.

26. Alta terminated the Plan due to the debtor's default under the Plan agreements, as of June 2, 2002.

27. Alta continued to pay health claims after Rocor failed to reimburse Alta.

28. After each premium payment, Alta provided stop-loss benefits and life and

---

**2.** Due to the miscalculation described in Footnote 1 herein, the actual amount paid was $116,843.10.

accident benefits for Plan participants. Further, Alta continued its claims paying services, making weekly payments to providers on behalf of Plan participants, regardless of Rocor's lack of reimbursement.

29. Alta remains unpaid for certain health claims, premium payments and administrative fees associated with the Plan.

30. Alta has filed a priority unsecured claim in the amount of $186,366.03 for alleged contributions to an employee benefit plan and a general unsecured claim in the amount of $34,774.35, for post-petition health claims it allegedly paid.

31. Unsecured creditors are unlikely to receive any distribution at all from the estate. Any distribution to priority claim creditors is contingent on potential preference recoveries.

*Conclusions of Law and Discussion*

■■■ Section 547[3] of the Bankruptcy Code permits the trustee to recover certain payments made to creditors shortly prior to filing bankruptcy. The purpose of the § 547 avoidance statute is to place all unsecured creditors on an equal basis for purposes of distribution of the debtor's assets. *See Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190 (10th Cir.2002). Section 547(b) permits avoid-

ance of certain transfers of the debtor's interest in property.[4] Based on the statutory language, in order for a transfer to be subject to avoidance as a preference:

(1) there must be a transfer of an interest of the debtor in property;

(2) on account of an antecedent debt;

(3) to or for the benefit of a creditor;

(4) made while the debtor was insolvent;

(5) made within 90 days before the date of the filing of the petition, if the creditor at the time of the transfer was not an insider; and,

(6) that left the creditor better off than it would have been if the transfer had not been made and the creditor had asserted its claim in a Chapter 7 liquidation.

*Id.* (citing *Jobin v. McKay (In re M & L Business Mach. Co., Inc.)*, 84 F.3d 1330, 1339 (10th Cir.1996)). The Estate bears the burden to prove the elements of avoidability under § 547(b). *Ogden*, 314 F.3d at 1196 (citing *Sender v. Johnson (In re Hedged–Investments Assocs., Inc.)*, 84 F.3d 1267, 1270 (10th Cir.1996)). All elements of § 547(b) must be proven before a transfer will be avoided. *Gillman v. Scientific Research Prods. Inc. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552 (10th Cir. 1995). The absence of any one of the

---

3. Unless otherwise specified, all references to sections herein are to Title 11 of the United States Code.

4. The language of the statute provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made
(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
§ 547(b).

elements constituting a voidable preference negates the Estate's claim. *Id.* at 554.

■ Alta takes issue with whether there was a transfer of an interest of the debtor in property, the first requirement of an avoidable preference. Simply stated, Alta's position is that the transfers in question were not transfers of the debtor's funds; rather, the funds belonged to the owner-operators who were Plan participants. Alta argues, without dispute from the plaintiff, that Rocor withheld from the compensation earned by the owner-operators for freight hauling, those amounts necessary to make the Plan payments. The parties also agree that the debtor did not place into a separate account, or otherwise segregate, the amounts by which the owner-operators' compensation was reduced for the Plan payments. The debtor merely deducted the amount of the Plan payments from the truckers' compensation and then made an accounting entry to reflect the transaction. There was no actual transfer of funds. Rocor then made the Plan payments by wire transfers from, and checks drawn, on the Account at Bank of Oklahoma.

■ In the Tenth Circuit, the presumption is that "deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established." *Amdura Nat'l Dist. Co. v. Amdura Corp., Inc. (In re Amdura Corp.),* 75 F.3d 1447 (10th Cir.1996)(citing 4 COLLIER ON BANKRUPTCY ¶ 541.11, at 541–75 (15th ed.1995)).[5] Thus, in a preference action, the trustee satisfies its burden of proving the debtor possessed an interest in the funds transferred by establishing that the debtor had legal title to and control over a bank account from which the transfers

were made. *Id.* at 1451. *See Southmark Corp. v. Grosz (In re Southmark Corp.),* 49 F.3d 1111, 1116 (5th Cir.1995); *Cassirer v. Herskowitz (In re Schick),* 234 B.R. 337, 343 (Bankr.S.D.N.Y.1999). " 'Control,' for preference purposes, means the legal right to use the funds." *Schick,* 234 B.R. at 343. Once these showings are made, the "burden then shifts to the defendant (1) to show that the debtor held only legal title and (2) to trace the equitable owner's interest to the specific [funds] at issue." *Id.* at 343–44. *See Sender v. The Nancy Elizabeth R. Heggland Family Trust (In re Hedged–Investments Assoc., Inc.),* 48 F.3d 470, 474 (10th Cir.1995)(the claimant must establish the original trust relationship by proving his title, identifying the trust fund, and where the fund has been mingled with the general property of the debtor, the claimant must sufficiently trace the funds).

The Account was titled in the name of the debtor. The checks and wire transfers were but a few of thousands of such transfers that were drawn on the Account during the 90–day preference period. Although there was no evidence presented regarding the identities of the other thousands of payees, the court can infer from the evidence that the debtor had legal title to the funds in the bank account and control over their use, including making payments to other creditors. The burden thus shifts to the defendant to make the requisite showing.

■ In defense, Alta submits that the amounts by which the debtor reduced the compensation paid to the owner-operators constituted withholdings made pursuant to an employee benefit plan under ERISA, citing 29 C.F.R. § 2510.3–102(a), and thus are not property of the debtor's estate.

---

**5.** While the issue in *Amdura* was determining what property constituted property of the estate under § 541, the § 541 inquiry and the § 547 preference inquiry are substantially similar.

Alta is correct that funds withheld by an employer for contribution to an ERISA plan are deemed to be held in trust and are not property of the debtor's estate, even if the funds have not been contributed to the plan. *In re College Bound, Inc.* 172 B.R. 399, 402–403, (Bankr.S.D.Fla. 1994). Alta cites the fact that the debtor supplied its owner-operators with a booklet which described the debtor's health benefit plan and stated that the plan had been established under ERISA. However, the requests for coverage which the debtor submitted to Alta described those eligible to participate in the plan as independent contractors. And the undisputed fact is that the Plan participants were indeed independent contractors of the debtor and not employees. By definition, ERISA covers plans established for employees. 29 U.S.C. § 1002. Independent contractors are not entitled to benefits under ERISA plans. *Glass v. IDS Financial Services, Inc.*, 778 F.Supp. 1029, 1066 (D.Minn.1991) (*citing Wolcott v. Nationwide Mut. Ins. Co.*, 884 F.2d 245, 250–51 (6th Cir.1989)). Therefore, the ERISA provisions have no application here.

Alta also suggests, with little elaboration, that the transferred funds were subject to a constructive trust and thus not property of the estate, citing *Southmark*, 49 F.3d. at 1117 as authority. Presumably, Alta's contention is that the funds were being held in trust for the owner-operators who were participants in the Plan. It thus becomes incumbent on Alta to trace the specific funds at issue.

 However, Alta avers it is unable to trace the funds in the Account because of the plaintiff's loss of bank records which it should have retained. Alta did not provide the court with legal support for the proposition that it should be excused from its burden to trace the funds. Furthermore, in order for a constructive trust to

be imposed there must be fraud, either actual or constructive. *Id.* at 1118. There is no evidence of either type of fraud present here. Without such evidence, defendant cannot prove the existence of a constructive trust, even if it could trace the funds.

 In determining whether funds transferred were property of a debtor's estate, it is fundamental to inquire whether the transfer of the funds diminished or depleted the debtor's estate. *Payne v. Clarendon National Insurance Co. (In re Sunset Sales, Inc.)* 220 B.R. 1005, 1013 (10th Cir. BAP 1998), aff'd 195 F.3d 568 (10th Cir.1999) (*citing Gill v. Winn (In re Perma Pac. Properties)* 983 F.2d 964, 968 (10th Cir.1992)). If the funds would have been available for distribution to creditors had there been no transfer, then the funds were property of the estate. The court has previously found that the transferred funds were under the control of the debtor and available for payment to creditors. Therefore, it must be concluded that the transfers did in fact diminish or deplete the debtor's estate.

For the foregoing reasons, the court finds that the funds transferred were property of the estate. Therefore, the court rules that the transfers were of an interest of the debtor in property.

 It is unclear whether Alta contests any other element of the plaintiff's *prima facie* case. It does not appear so in its trial brief or closing argument. Yet, it does stress throughout that it holds a priority unsecured claim of $186,366.03 for alleged contributions to an employee benefit plan. Assuming that such assertion bears on the element of the hypothetical liquidation test of § 547(b)(5), the court will address it. That subsection requires the plaintiff to prove as part of its *prima facie* case that the defendant received

more by the transfer than it would have received in a chapter 7 liquidation if the transfer had not been made. In order to make this determination, the court must decide the transferee's creditor class and determine what distribution that class would have received if the transfer had not been made. 5 COLLIER ON BANKRUPTCY, § 547.03[7] (15th ed. rev.2006). Generally, so long as the distribution to unsecured creditors in a bankruptcy case is less than 100%, "any payment on account to an unsecured creditor during the preference period will enable that creditor to receive, for preference-avoidance purposes, more than it would have received in a hypothetical chapter 7 liquidation had the payment not been made." *Jacobs v. Matrix Capital Bank (In re AppOnline.com, Inc.)*, 315 B.R. 259, 281 (Bankr.E.D.N.Y.2004). *See also, Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Millard Partners)*, 145 B.R. 682 (D.Colo.1992). On the other hand, a payment to a fully secured creditor cannot constitute a preferential transfer because the creditor would not receive more than it would have received in a chapter 7 liquidation. *Sloan v. Zions First Nat'l Bank (In re Castletons, Inc.)*, 990 F.2d 551, 554 (10th Cir.1993).

 Between secured claims and unsecured claims are priority claims. A debtor's payment to a creditor with a priority claim would not constitute a preference if the creditor would have received the same distribution in a chapter 7 liquidation case. *Id.* Statutory priority is narrowly construed in the Tenth Circuit. *State Ins. Fund v. Southern Star Foods, Inc. (In re Southern Star Foods, Inc.)*, 144 F.3d 712, 714 (10th Cir.1998)(*citing Isaac v. Temex Energy, Inc. (In re Amarex, Inc.)*, 853 F.2d 1526, 1530 (10th Cir.1988)). The provision on which defendant relies for its priority claim, § 507(a)(4), grants priority to an allowed unsecured claim for "contributions to an employee benefit plan," with certain limitations not applicable to this discussion. The court has previously determined that the Plan was not an employee benefit plan because the participants were not employees, but rather independent contractors. Consistent with the narrow construction of priority claims, the court concludes that Alta does not have a priority claim for contributions to an employee benefit plan under § 507(a)(4).

Failing to establish that it has a priority claim, Alta has only a general unsecured claim. The court has found, as Alta admitted in its proposed findings of fact, that it was unlikely that any distribution would be made to unsecured creditors. The Liquidation Trustee, Janice Loyd, testified that the Estate was administratively insolvent. She opined that even if the Estate were successful in pending adversary litigation, priority claims would not be paid in full, with the consequence that there would be no distribution at all to unsecured claimants. In any event, Ms. Loyd's testimony leaves little doubt that unsecured creditors would receive less than a 100% distribution. Alta offered no controverting evidence. Therefore, the court finds that the Estate has satisfied this remaining element of its § 547(b) *prima facie* case.

 The court will now consider Alta's defenses. First to be addressed are the defenses of contemporaneous exchange for new value under § 547(c)(1), and subsequent new value under § 547(c)(4). The purpose of both defenses is to protect transactions that do not adversely affect other creditors because the estate has received new value. The creditor bears the burden of establishing all elements of these affirmative defenses. § 547(g).

 An element of both defenses is that the creditor gave "new value" to the debtor. *See* § 547(c)(1)(A) and § 547(c)(4).

The term "new value" is defined in § 547(a)(2).

> "[N]ew value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation,

*Id.*

Alta contends that the new value it provided consisted of its continued payment of the health claims of the Plan participants and the continued provision of insurance for those participants. It argues that providing such benefits to the participants was a benefit to the debtor and hence "new value" because it encouraged the retention of the owner-operators as freight haulers and also assisted in the recruitment of new owner-operators. The transfers were merely reimbursements to Alta for the new value it provided and thus did not deplete the bankruptcy estate to the detriment of creditors. In support of this proposition, Alta cites *Peltz v. Hartford Life Ins. Co. (In re Bridge Information Systems, Inc.)*, 321 B.R. 247, 250 (Bankr. E.D.Mo.2005). *Bridge* held that a creditor's payment of employee benefits to the debtor's employees constituted "new value" under § 547(a)(2), citing *Jones Truck Lines, Inc. v. Central States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 327 (8th Cir.1997). It deduced that the wire transfers involved there were merely the debtor's reimbursement to the creditor for disability payments the creditor had made to the debtor's employees. "Thus, the Wire Transfers in no way depleted Bridge's financial position on the eve of bankruptcy to the detriment of Bridge's other creditors ...." *Bridge*, 321 B.R. at 255.

The *Bridge* court made a puzzling deduction. Surely, the payments by Bridge to Hartford "depleted Bridge's financial position". Undoubtedly, its bank account was reduced by the amount of the transfers, without receiving anything tangible in return. What the court must have meant, but does not articulate, is that the value to the debtor of the employee benefits which the creditor provided to the employees was such that the payment made by debtor to reimburse the creditor for those benefits did not diminish the value of the debtor's estate. It is that apparent conclusion which must be examined here to determine whether the benefits Alta provided in this case constitute "new value".

There is no doubt that Rocor's owner-operators who participated in the Plan benefitted from Alta's payment of their health claims and the insurance coverage. The question is whether that constitutes "new value" to the debtor. *Jones* is the leading authority for the proposition that the provision of employee benefits for the debtor's employees constitutes new value. That case held that the debtor-employer received new value in exchange for (under § 547(c)(1)) and/or subsequent to (under § 547(c)(4)) the payments made by the debtor to its employees benefit fund in the form of the continued services of the employees. *Jones*, 130 F.3d at 327. That the "new value" came from the employees rather than directly from the creditor was irrelevant to the court. Thus, *Jones* concluded that a transfer of "new value" by a third party to the debtor may satisfy the new value requirement. *Id.* at 327–28.

*Jones* also ruled that absent contrary evidence, the value of the employee services was presumed to equal the wages and benefits the employer contracted to

pay. Thus the creditor was not required to quantify the new value. *Id.* at 328, n. 4.

The Tenth Circuit has not addressed directly whether the continued services of a debtor's employees (or independent contractors) could constitute new value under either § 547(c)(1) or (c)(4). However, the circuit has considered, with somewhat mixed results, whether there must be some correlation between the value of the "new value" and the value of the preferential transfer. In *Kenan v. Fort Worth Pipe Co. (In re George Rodman, Inc.)*, 792 F.2d 125 (10th Cir.1986), the court held that a creditor's release of its lien on a well that was being drilled (and that was later determined to be a dry hole and of no value) in exchange for the debtor's payment represented a contemporaneous exchange for new value. The case specifically held that a valuation of the property transferred was not required under § 547(c)(1).

In *Lowrey v. U.P.G. Inc. (In re Robinson Bros. Drilling, Inc.)*, 877 F.2d 32, 33 (10th Cir.1989), the circuit gave its interpretation of the *Rodman* decision. The court first distinguished the *Rodman* facts, stating that there the transfer by the debtor was equal to the amount of the lien released by the creditor. Thus, the estate was not diminished by the transfer, and no valuation was required. In contrast, the creditor in *Robinson Bros.* released liens securing only a small portion of the debt owed by the debtor, and it recovered additional sums on the unsecured part of the debt. The court then held that for a transfer to be protected under § 547(c)(1), it must be established that the value given by the creditor in the contemporaneous transfer "substantially approximated" that which was transferred by the debtor. *Id.* at 34.

A similar result was reached in *Electronic Metal Prods., Inc. v. Bittman (In re Electronic Metal Prods., Inc.)*, 916 F.2d 1502 (10th Cir.1990). There, the court considered whether there was "new value" in an attorney's agreement to continue providing legal services to the debtor in exchange for periodic payments on antecedent bills that the debtor owed to the attorney. In rejecting the attorney's argument, the court stated that the term "new value" as defined in the Bankruptcy Code implied that the creditor must prove the specific valuation in "money or money's worth in goods, services or new credit." *Id.* at 1506 (*citing Robinson Bros.*, 877 F.2d at 32, and *Jet Florida, Inc. v. American Airlines, Inc. (In re Jet Florida Systems, Inc.)*, 861 F.2d 1555, 1559 (11th Cir. 1988)).

In *Sunset Sales*, 220 B.R. at 1019, the creditor insurance company asserted a § 547(c)(1) defense, arguing that it provided new value when it issued reclamation bonds in exchange for premium payments. The creditor argued that the bonds allowed the debtor to continue to conduct its mining operations, but it produced no evidence of the value of this purported "new value." Relying on *Electronic Metal Prods.*, the court rejected the creditor's argument concluding that "[T]o hold otherwise would make nearly all debtor-creditor relationships insulated from recovery under § 547(b)". *Sunset Sales*, 220 B.R. at 1020. The court made the interesting observation that there was "no way" to value what "new value" the creditor provided.

In the present case, while Alta claims that the "new value" to the debtor included the continued employment of the owner-operators, it failed to prove how many, if any, of the Plan participants in fact remained engaged in hauling freight for the debtor subsequent to the transfers. Alta also failed to show how the recruiting of new owner-operators was enhanced.

More important, Alta made no attempt to place a value on this "new value."

While an apparent incongruity exists between the holdings of the *Rodman* case and the other Tenth Circuit cases that followed, it would seem that the latter cases not only represent this circuit's current view of the subject, but are consistent with the wording of the statutory definition of "new value". Defining the term to mean "money or money's worth" surely suggests that the "new value" must be measured in such terms. Thus, this court follows the holdings of *Robinson Bros.* and its progeny that, in order to establish a "new value" defense, a creditor must prove the specific valuation in "money or money's worth" of the new value. Since Alta made no attempt to prove the specific valuation of the purported "new value" provided by it, it cannot maintain its "new value" defenses.[6]

Alta also claims it provided subsequent new value to the debtor by paying health claims and providing insurance to the Plan participants after the petition date. However, post-petition advances of new value may not be included in the subsequent new value analysis. *Clark v.*

*Frank B. Hall & Co. (In re Sharoff Food Service, Inc.)*, 179 B.R. 669 (Bankr.D.Colo. 1995).

For the foregoing reasons, the court concludes that Alta has failed to establish a defense under either § 547(c)(1) or § 547(c)(4).

The court now turns to the last defense asserted by the defendant, the ordinary course of business defense. This defense provides that the Estate may not avoid a preferential transfer:

(2) to the extent such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

§ 547(c)(2)(C).[7]

The Bankruptcy Appellate Panel for the Tenth Circuit has held, in accordance with other circuit courts, that the ordinary course exception contains both subjective and objective elements.

---

6. In closing argument, Alta's counsel alludes to what this court had "held" regarding "new value" in another case, *Rocin Liquidation Estate v. Pan America Life Ins. Co.*, Adv. No. 04–1270–WV (Bankr.W.D. Okla. filed Aug. 31, 2002). Having ruled in that case that the plaintiff had failed to prove a necessary element of its preference claim, and thus resort to § 547(c) defenses was unnecessary, this court's comments regarding new value was mere dicta. Further, as noted in the court's opinion, the plaintiff failed to support its opposition to the new value defense and thus the issue was not thoroughly briefed.

7. This section of the statute was amended pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, ("BAPCPA") Pub.L. No. 109–8, § 409 (2005), and is effective in cases commenced on or

after October 17, 2005. Unlike the prior version of the statute, applicable in the instant case, which requires the defendant to prove all three prongs of the "ordinary course of business" defense, the amended statute requires merely that the defendant prove the first prong and then prove either that the transfer was made "in the ordinary course of business or financial affairs of the debtor and the transferee" *or* that it was made according to "ordinary business terms." Thus, "[t]he 2005 amendments make it easier to invoke the ordinary course of business defense successfully in a preference action." 5 COLLIER ON BANKRUPTCY ¶ 547.04[2] (15th ed. rev.2005). However, the 2005 amendments do not apply in the present case since the Debtor filed its bankruptcy petition before the October 17, 2005 effective date.

*Sunset Sales,* 220 B.R. at 1020. *See Gulf City Seafoods, Inc. v. Ludwig Shrimp Co., Inc. (In re Gulf City Seafoods, Inc.),* 296 F.3d 363 (5th Cir.2002); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30 (2nd Cir.1996); *Advo–System, Inc. v. Maxway Corp.,* 37 F.3d 1044 (4th Cir. 1994); *In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029 (7th Cir.1993). The subjective element examines whether the transfers at issue were "ordinary as between the parties," and the objective element considers whether they were "ordinary in the industry." *Sunset Sales,* 220 B.R. at 1020. A transaction must satisfy both elements to qualify as an exception to a preferential transfer. The Tenth Circuit has held that this "defense should be narrowly construed." *M & L Bus. Mach. Co.,* 84 F.3d at 1339. Findings under § 547(c)(2) are generally considered to be factual in nature. *Id.*

■ The ordinary course of business exception is an affirmative defense. *Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners),* 12 F.3d 1549 (10th Cir.1993). Thus, defendant bears the burden to establish each of these elements by a preponderance of the evidence. *Id.* at 1553.

■ The court will first address the objective element of the ordinary course defense found at § 547(c)(2)(C), which requires that the transfer must have been according to "ordinary business terms." A defendant need only establish that its own dealings with the debtor fall "within the outer limits of normal industry practice." *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 390 (7th Cir.1997)(citing *Tolona Pizza,* 3 F.3d at 1033). The *Tolona* court elaborated on the concept of "ordinary business terms" as set forth in subsection (c), concluding that the phrase "refers to the *range* of terms that encompass the practices in which firms similar in some gener-

al way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *Tolona,* 3 F.3d at 1033 (emphasis in original). Stated another way, "ordinary business terms" means that "the transaction is not so unusual as to render it an aberration in the relevant industry." *Luper v. Columbia Gas of Ohio, Inc. (In re Carled, Inc.),* 91 F.3d 811, 818 (6th Cir.1996). Hence, the "industry standard[ ] do[es] not function as a litmus test by which the legitimacy of a transfer is [ ]judged, but function[s] as a general backdrop against which the specific transaction at issue is evaluated." *Miller v. Florida Mining & Materials (In re A.W. & Assoc., Inc.),* 136 F.3d 1439, 1443 (11th Cir.1998). The Tenth Circuit has defined this language to refer to "the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy." *Sunset Sales,* 220 B.R. at 1021 (citing *M & L Bus. Mach. Co.,* 84 F.3d at 1339, quoting *Meridith Hoffman Partners,* 12 F.3d at 1553).

■ In order to establish the "ordinary business terms" in the industry, a defendant must show that the disputed transfer was "made according to terms that are ordinary when compared to those employed by other firms in the same industry." *Tolona Pizza,* 3 F.3d at 1032–1033. Thus, the defendant must produce objective evidence of the range of prevailing practices utilized within the defendant's industry involving transactions similar to the transfer in question and that the transfer fits into that range.

Courts have permitted such evidence to come from a variety of sources, including from a defendant's own corporate representatives. *See, e.g., Tolona Pizza,* 3 F.3d at 1031–33 (testimony of the defendant's executive vice president, based on his per-

sonal knowledge regarding the practices of his competitors, was sufficient under § 547(c)(2)(C)); *Jones v. United Sav. & Loan Assn. (In re U.S.A. Inns),* 9 F.3d 680, 684 (8th Cir.1993)(an employee of the defendant may establish the prevailing industry standard based on his personal knowledge of that standard). Some courts that have permitted such testimony recognize, however, that employee-witness testimony is inherently suspect given the witness' lack of disinterestedness. *See Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.),* 957 F.2d 239 (6th Cir.1992)(testimony of defendant's president lacked credibility and reliability); *Barber v. Riverside Int'l. Trucks, Inc. (In re Pearson Indus., Inc.),* 142 B.R. 831, 844–45 (Bankr.C.D.Ill.1992)(testimony of defendant's employees was "clearly that of interested parties and self-serving .... Furthermore, there was no evidence which specifically described the details of industry practices" similar to those at issue there). *See also Finley v. Mr. T's Apparel, Inc. (In re Washington Mfg. Co.),* 144 B.R. 376 (Bankr.M.D.Tenn.1992). In addition, "[g]eneral testimony by an employee of the defendant, unsupported by any specific data is insufficient to prove 'ordinary business terms.'" *Official Committee of Unsecured Creditors v. Pedersen & Houpt (In re Crystal Medical Prods., Inc.),* 240 B.R. 290, 299 (Bankr.N.D.Ill.1999)(citing *Schwinn Plan Comm. v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle Co.),* 205 B.R. 557, 572 (Bankr.N.D.Ill.1997)).

On the other hand, other courts have determined the relevant industry standard as a result of expert witness testimony on the issue. *See, e.g., Fitzpatrick v. Rockwood Water, Wastewater & Nat. Gas Sys. (In re Tennessee Valley Steel Corp.),* 201 B.R. 927 (Bankr.E.D.Tenn.1996)(the court relied primarily on the testimony of an expert witness to determine the range of standards within the relevant industry);

*Marlow v. Federal Compress & Warehouse Co., (In re Julien Co.),* 157 B.R. 834 (Bankr.W.D.Tenn.1993)(same).

Having considered these evidentiary options, this court is of the view that a preference defendant may choose, as part of its trial strategy, whether to attempt to satisfy its § 547(c)(2)(C) burden either by (a) expert witness testimony, (b) testimony from the defendant's own corporate representatives or employees or (c) testimony of a fact witness not connected with the defendant. If a defendant chooses options (b) or (c), however, the court may deem such evidence sufficient only if the defendant's witnesses can demonstrate sufficient experience in the relevant industry and personal knowledge of the defendant's competitors' credit practices with other debtors. Such personal knowledge must be based on specific data regarding the defendant's competitors' credit practices. Vague or general testimony from these non-expert witnesses which is unsupported by such specific data is insufficient. And, given the likelihood that a lack of disinterestedness might affect an employee-witness' testimony, the court will also weigh such witness' potential interest in the outcome of the preference action against the quality and reliability of the testimony.

Here, Alta produced only scant evidence of the industry standard. Rick Bailey, a manager of group underwriting for Alta's parent company, Great West Life Insurance Company, testified about his knowledge of the health benefit plans of Alta's competitors. His knowledge was based on proposals given to potential customers of Alta by competing insurance companies. Bailey's testimony was limited to the type of payment plans offered by the competing companies, in general, and how the plans were set up. He confessed

no knowledge of the credit terms of the other companies nor their default rates. He offered no opinion on the actual credit or collection practices of any Alta competitors. He had no independent knowledge of actual credit or collection practices of Alta, either, his testimony being based solely on his review of Alta's files. Because Bailey's testimony was not based on knowledge of the actual credit practices of Alta's competitors and was vague and general in nature, it cannot serve as a basis for establishing an industry standard under § 547(c)(2)(C).

Alta's witness, David Rhoades, an insolvency consultant, opined that the manner of handling payments and the billing practices of the debtor, as described by Bailey in his testimony, were consistent with industry standards. Rhoades' opinion was based on recent interviews he had conducted with some nine persons in the insurance industry and research he did on the internet. Rhoades admitted he had never worked in the insurance industry. Nor did he testify about any experience he had gained in the industry. It is clear to the court that Rhoades did not have sufficient knowledge nor expertise to render an opinion on the insurance industry standards. Alta's other witness, Deanna Sweet, testified regarding Alta's practices, but she did not opine concerning industry standards. Thus, Alta has failed to sustain its burden of proof with regard to objective ordinariness, one of the elements of the ordinary course of business defense. Accordingly, its § 547(c)(2) defense fails.

■ The parties disagree about the amount of the transfers in controversy. In the stipulations contained in the Final Pretrial Order, Alta admitted receiving payments totaling $126,797.81, including one wire transfer on July 9, 2002, of $975.50.

In its contentions in the same order, the Estate asserted, in addition to the stipulated transfers, an additional transfer to Alta in the amount of $16,959.53, on or about July 9, 2002. This is consistent with the Estate's proposed findings of fact. Yet, in its closing argument, the Estate's counsel urged that Alta had received four additional transfers by checks which cleared the debtor's account during the preference period, so that there were a total of 15 avoidable transfers at issue, aggregating $224,158.50. As proof, counsel cited Rocor's bank records which were in evidence. Alta vigorously objected to the inclusion of these four additional transfers, arguing that it had no prior notice of the plaintiff's claim as to such transfers.

Alta's argument is well taken. Even if the four additional transfers are shown in the voluminous pages of the debtor's bank records in evidence, Alta had no advance notice that the plaintiff was seeking their avoidance. Certainly, there is no indication in the Final Pretrial Order, nor in the plaintiff's proposed findings of fact, that it was seeking such. To allow the plaintiff to include these four additional transfers in its claim at this late date seems patently unfair and will not be permitted.

There is a further issue concerning the transaction on July 9, 2002. The Estate contends that the debtor transferred $16,959.53 to Alta on or about July 9, 2002, while Alta alleges that the payment was only $975.50.[8] Alta admits it was paid the $16,959.53 by wire transfer on July 9, 2002, but argues that there was a credit later made on the wire transfer of $15,980.03, so that the net effect of the transfer was $975.50 (sic). The plaintiff pointed to debtor's bank statement (Plaintiff's Exhibit 2), Bates stamp 0632, as evidence of the $16,959.53 payment. Yet, the following page of the Exhibit, Bates stamp 0363

8. As was earlier pointed out, this amount should have been $979.50.

shows the credited amount of $15,980.03, a fact verified by witness Janice Loyd. Thus, the court concludes that the plaintiff's claim as to the July 9, 2002 transaction is limited to the stipulated amount of $975.50 and does not include the $16,959.53 which the plaintiff seeks. Thus, the total amount of the avoidable transfers is $126,797.81.

There were numerous arguments made by counsel for the parties. To the extent such arguments are not addressed in this opinion, the court concludes that they were unnecessary or inapposite for the resolution of this case. To the extent the court took under advisement the admission of exhibits, such exhibits are admitted.

Based on the preceding, the court finds that the transfers from the debtor to Alta in the 90 days prior to the petition date, in the amount of $126,797.81, are avoidable as preferences under § 547(b). Judgment in favor of the Estate shall issue accordingly.

### *JUDGMENT*

Pursuant to the Findings of Fact and Conclusions of Law entered herein this day, IT IS ORDERED, ADJUDGED and DECREED that judgment is entered in favor of the plaintiff, Rocin Liquidation Estate (the "Estate"), and against the defendant, Alta AH & L ("Alta"), on the Estate's adversary complaint. Accordingly, the Estate is entitled to avoidance of the preferential transfers, as sought by the adversary complaint, and to recover from Alta the amount of $126,797.81, upon all of which post-judgment interest as provided by law shall accrue until paid, plus costs of this action.